2012 ME 121

**STATE FARM MUTUAL AUTOMO-
BILE INSURANCE COMPANY**

v.

**ESTATE OF JAMES CAREY.**

Supreme Judicial Court of Maine.

Argued: Sept. 14, 2011.

Reargued: April 12, 2012.

Decided: Oct. 25, 2012.

Daniel G. Kagan, Esq. (orally), and Robert H. Furbish, Esq., Berman & Simmons, Lewiston, for appellant Estate of James Carey.

John J. Wall, III, Esq. (orally), Monaghan Leahy, LLP, Portland, for appellee State Farm Mutual Auto Insurance Company.

Bruce C. Gerrity, Esq., and Roy T. Pierce, Esq., Preti, Flaherty, Beliveau & Pachios, LLP, Augusta, for amici curiae American Insurance Association, Property Casualty Insurers Association of America, National Association of Mutual Insurance Companies, and Maine Association of Insurance Companies.

Richard L. O'Meara, Esq., Murray, Plumb & Murray, Portland, for amicus curiae Maine Trial Lawyers Association.

Panel: SAUFLEY, C.J., and LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority: SAUFLEY, C.J., and LEVY, MEAD, and GORMAN, JJ.

Concurring: SILVER, and JABAR, JJ.

LEVY, J.

[¶ 1] This appeal arises from a motor vehicle collision involving Roger T. Linton and James Carey that resulted in Carey's death. At the time of the collision, Linton was driving a truck owned by Jonathan Jennings, for whom Linton worked as an independent contractor. Jennings's insurer, State Farm Mutual Automobile Insurance Company, filed a declaratory judgment action against Carey's Estate and Linton to determine whether it was responsible for liability coverage and obligated to defend and indemnify Linton for claims arising from the collision. After a bench trial, the Superior Court (Kennebec County, *Mills, J.*) entered a judgment in favor of State Farm, concluding that Linton was not an insured covered by Jennings's policy because his use of the truck was not within the scope of Jennings's consent. We vacate the judgment, clarify the applicable burdens of the parties, and remand for further proceedings.

## I. BACKGROUND

[¶ 2] The court found the following facts, which are supported by competent evidence in the trial record. *See Sanseverino v. Gregor*, 2011 ME 8, ¶ 2, 10 A.3d 735.

[¶ 3] Jennings owns a masonry company in Manchester. In 2006 and 2007, Linton was employed by Jennings's company, and in 2008, Linton worked with the company as an independent contractor. While Linton was an employee, he used company vehicles to drive between work and his home in Readfield. He also used company vehicles for his own landscaping jobs and for getting groceries, going fishing, and hauling hay. As an independent contractor, Linton's use of company vehicles was less frequent, and he did not use company vehicles outside the regular workday, except to occasionally haul hay and travel to and from work. During the period that he was an independent contractor, if Linton wanted to use a company vehicle he would typically make a specific request to Jennings. Jennings did not place any specific restrictions on Linton's use of company vehicles; however, Linton understood that there were limits on how he could use company vehicles and that Jennings would not have permitted him to use a company vehicle while drinking.

[¶ 4] In October 2008, Linton was working as an independent contractor for Jennings's company on a job in Kents Hill. The materials and equipment for the job had to be transported to and from the

jobsite each day. Jennings's company is located farther from the jobsite than Linton's home, which was approximately eight miles from the jobsite.

[¶ 5] On October 7, Linton drove to the jobsite with a coworker in a heavily loaded twenty-foot-long company truck that neither had used before. The truck was cumbersome and not suited for personal use because of how it handled when it was loaded. Between 3:00 and 4:00 p.m., Jennings received a voicemail from Linton asking whether he could take the truck home after work. Sometime later, Jennings called Linton's coworker's phone and left a voicemail stating that it was fine for Linton to drive the truck home and back to the jobsite in the morning.[1]

[¶ 6] Linton did not drive the truck home. Instead, he drove the truck to his girlfriend's workplace in Winthrop; then to a gas station in Manchester where he drank two sixteen-ounce beers; then to the parking lot of a tavern in Winthrop; and then to a pond in Hallowell where he met a friend. From there, he drove to the friend's house in Farmingdale and then drove the friend toward Chelsea to visit the friend's nephew. On the way to Chelsea, the truck collided with a vehicle driven by James Carey, who died as a result. The site of the collision was approximately twenty miles from the jobsite, twenty miles from Linton's home, and ten miles from the company. At the time of the collision, Linton had a blood alcohol content of .12%.[2]

[¶ 7] Jennings had an automobile insurance policy with State Farm covering the truck operated by Linton. The omnibus clause of the State Farm policy defines an "insured" to include "any other person while using [Jennings's] car if its use is within the scope of [Jennings's] consent."

[¶ 8] In June 2009, State Farm filed a complaint against Carey's estate and Linton seeking a declaratory judgment that Jennings's liability policy with State Farm did not cover Linton, and that State Farm had no duty to defend or indemnify Linton for claims arising from the collision. After a bench trial in August 2010, the court found that Jennings gave Linton implied consent either to drive the truck home and back to work, based on the voicemail messages exchanged on October 7, 2008, or to use the truck for personal errands or hauling hay, based on their previous course of conduct. The court concluded that under either view, Linton's use of the truck for social activities significantly exceeded the time, distance, and purpose of any uses that Jennings had ever permitted. Because Linton's use of the company truck was more than a minor deviation from the scope of Jennings's consent, the court concluded that Linton was not an additional insured under Jennings's policy. The court entered a judgment in favor of State Farm and this appeal followed.

## II. LEGAL ANALYSIS

■ [¶ 9] The Estate asserts that the court erred in several respects. We consider here whether the court erred in its application of the minor deviation rule in determining that Linton's use of the truck

---

1. Jennings testified as follows:

    Q. Now, after you received [Linton's] message, did you get back to him?
    A. Well, I left a message on [Linton's coworker's] cell phone, I didn't talk to [Linton] directly.
    Q. And what did you say in the message?

    A. I—well, this made sense to me, to drive a shorter distance than a longer distance, so I said something like that's fine, you know, if you drive it to your house and then just drive it back in the morning.

2. Linton was convicted on felony charges related to the accident.

exceeded the scope of Jennings's consent. We conclude that we must reconsider how the minor deviation rule is best applied, so as to account for the change in public policy that occurred when the Legislature adopted the policy of universal financial responsibility for vehicles registered in Maine.[3] *See* 29–A M.R.S. §§ 1601–1612 (2011).

■■■ [¶ 10] To determine the applicability of an omnibus clause of an insurance policy, a court must determine the scope of the named insured's consent and whether a driver's use of a vehicle was within that scope. *See Taylor v. U.S. Fid. & Guar. Co.*, 519 A.2d 182, 183–84 (Me.1986) (reviewing the scope of consent to determine coverage). The scope of consent may be determined from evidence of express or implied permission. *See id.* at 183 (noting that without evidence of express permission, the scope of permitted use may be implied); *see also* 6C John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 4365 (1979) (noting that express permission is "not essential" for protection and "permission may be implied for such use under the facts and circumstances of the case").

[¶ 11] We have historically applied the minor deviation rule to determine whether the use of a vehicle was within the scope of consent. We first addressed the rule, without identifying it as such, in *Johnson v. American Automobile Insurance Co.*, 131 Me. 288, 293, 161 A. 496 (1932). In *Johnson*, an employee was told to drive the employer's car to the employee's home to wash and polish it, and to return the car a few hours later that morning. *Id.* at 290, 161 A. 496. Instead of returning the car, the employee drove it several miles in the opposite direction; along the way, the employee crashed the car into a telephone pole, injuring a passenger. *Id.* at 289–90, 161 A. 496. On appeal, we addressed the following question: "Was the automobile, at the time of the accident, being operated, within the scope of the 'extended coverage' clause in the liability policy, 'with the consent of such named Assured,' (i.e., the consent of the owner of the automobile)?" *Id.* at 289, 161 A. 496. We determined that the employer's instruction to the employee "was simply consent that the car be used, within reasonable and incidental limits, for that purpose" and because the trial court found that the employee's use when the accident occurred was not within the employer's consent, there was no coverage. *Id.* at 293, 161 A. 496.

[¶ 12] In *Savage v. American Mutual Liability Insurance Co.*, we confirmed *Johnson*'s adoption of the rule "permitting minor deviations":

> In *Johnson* there was a substantial deviation from the permitted use both as to purpose and place of operation. We find nothing in *Johnson* which would deny coverage where the actual use is primarily for the purpose for which permission was given and there are no more than minor deviations as to time and place of operation. Under such circumstances the risk of accident is not appreciably increased and permission would un-

---

**3.** After hearing initial argument in this case in September 2011, we requested additional briefs and arguments from the parties, and invited amicus briefs, on the issue of whether the minor deviation rule remains viable in Maine. Specifically, we invited the parties to brief whether the rule, which predates the requirement that all operators and owners of vehicles that are required to be registered in Maine maintain proof of financial responsibility, is consistent with 29–A M.R.S. §§ 1601–1612 (2011), or whether we should instead adopt the initial permission rule, which is applied in other jurisdictions. *See, e.g., Progressive N. Ins. Co. v. Concord Gen. Mut. Ins. Co.*, 151 N.H. 649, 864 A.2d 368, 374, 376 (2005).

doubtedly have been given for such use if it had been sought. Under such a rule the insurer entrusts to the insured the extension of policy coverage but full effect is given to the restrictions imposed by the insured when he permits the use of the insured vehicle by another. In these days when reduced premiums are being offered to those who maintain a low level of accident liability, the ability of an insured owner to impose effective restrictions on permitted use by another becomes important to the insured as well as to the insurer.

158 Me. 259, 263–64, 182 A.2d 669 (1962).

[¶ 13] The minor deviation rule was again applied in *Allstate Insurance Co. v. Lyons*, where we distinguished between "use" and "operation" of a vehicle for the purpose of determining the scope of permission and noted that "[o]ur decision today in no way limits our earlier decisions in Savage ... or Johnson."[4] 400 A.2d 349, 352–53 (Me.1979). In *Taylor v. United States Fidelity & Guaranty Co.*, we affirmed a trial court's conclusion "that there is no dispute that [the operator's]

use of the Oldsmobile 'a substantial deviation from the permitted use both as to purpose and place of operation.'" 519 A.2d at 184 (quoting *Savage*, 158 Me. at 263, 182 A.2d 669).

[¶ 14] All of these decisions predate the Legislature's adoption of mandatory motor vehicle financial responsibility. In 1987, the Legislature enacted "An Act to Require Maintenance of Financial Responsibility by All Motorists," L.D. 1798 (113th Legis.1987). P.L.1987, ch. 341, §§ 1–7. The bill required that "[e]very operator or owner of a motor vehicle, trailer or semitrailer shall maintain at all times the amounts of motor vehicle liability insurance or financial responsibility specified" in a separate section of the financial responsibility statute. *Id.* § 3 (effective Jan. 1, 1988) (originally codified at 29 M.R.S.A. § 780(1) (Supp.1988)). The purpose of the Act was described as follows:

The Legislature finds that the economic damage inflicted by uninsured motorists goes uncompensated in many cases due to the failure of motorists to maintain liability insurance or other

---

4. The Estate also contends that the court erred by treating Linton's operation of the truck while under the influence of alcohol as one of the factors supporting its conclusion that Linton's use of the truck exceeded the scope of Jennings's consent because the court concluded that "illegal activity was never contemplated in connection with [Linton's] use of the vehicle and ... [i]t was not agreed that he would take passengers or use the truck while drinking." In *Lyons* we distinguished the terms "use" and "operation" as they relate to the omnibus clause of an automobile insurance policy:

[T]he words *use* and *operation* are not synonymous. The *use* of an automobile denotes its employment for some purpose of the user; the word *operation* denotes the manipulation of the car's controls in order to propel it as a vehicle. *Use* is thus broader than *operation*.... One who operates a car uses it, ... but one can use a car without operating it.

*Allstate Ins. Co. v. Lyons*, 400 A.2d 349, 352 (Me.1979) (emphasis altered) (quoting *Indem. Ins. Co. of N. Am. v. Metro. Cas. Ins. Co. of N.Y.*, 33 N.J. 507, 166 A.2d 355, 358 (1960)).

Like the insurance policy in *Lyons*, Jennings's policy defines "insured" according to whether the *use* of a vehicle is within the scope of consent: "insured means ... any other person while using [your] car if its use is within the scope of consent of you or your spouse." In light of the distinction between "use" and "operation" articulated in *Lyons*, it follows that driving while intoxicated relates to the manner of operation of a vehicle, rather than the purpose of its use. Therefore, to the extent that the court considered Linton's consumption of beer and his blood-alcohol level in arriving at its conclusion that his use of the truck exceeded the scope of Jennings's consent, the court erred in its interpretation of the term "use" as employed in the omnibus clause of Jennings's policy.

means to insure just compensation for victims of accidents. The present law condones the financial irresponsibility of these motorists until they have already inflicted injuries or damage for which they may be unable to provide compensation. The purpose of this subchapter is to reduce the likelihood that financially irresponsible motorists will operate on the State's highways by instituting a requirement that motorists provide evidence of financial responsibility pursuant to this subchapter.

*Id.* (originally codified at 29 M.R.S.A. § 779 (Supp.1988)).

[¶ 15] Effective in 1995, title 29 was repealed in full and replaced by title 29–A, but the substance of the mandatory financial responsibility provisions remained as previously set forth. *See* P.L.1993, ch. 683, §§ A–1, A–2. Title 29–A M.R.S. § 1601(1) (2011) now provides: "**Requirement.** An operator or owner of a vehicle registered in this State or required to be registered in this State shall maintain the amounts of motor vehicle financial responsibility specified in section 1605." Failure to produce proof of insurance or financial responsibility constitutes a violation of section 1601 that may result in a fine, 29–A M.R.S. § 1601(5), or a suspension of the individual's driver's license, registration, or right to apply for a license or registration, 29–A M.R.S. § 1601(6).

[¶ 16] Our 1962 decision in *Savage* adopted the minor deviation rule at a time when our state's laws did not require motor vehicle liability insurance or financial responsibility. In *Savage*, we rejected the plaintiff's argument for adoption of the more liberal initial permission rule, which would have extended coverage to the driver if she had permission to use the vehicle in the first instance. 158 Me. at 261, 264, 182 A.2d 669. We noted that the initial permission rule "finds favor" in states with

compulsory liability insurance "because it implements an underlying legislative policy that, for the protection of the public, liability insurance should follow the automobile under nearly all circumstances." *Id.* at 263, 182 A.2d 669. Although such a legislative policy did not exist in Maine prior to 1987, it does now. *See* 29–A M.R.S. § 1601(1). Accordingly, we review the minor deviation rule in view of this change in policy.

[¶ 17] Jurisdictions that have adopted the initial permission rule and rejected the minor deviation rule have cited a number of policy reasons, which were summarized well by the Supreme Court of Louisiana:

The primary justification for the "initial permission" rule is that it effectively furthers the state's policy of compensating and protecting innocent accident victims from financial disaster. Moreover, its application serves to discourage collusion between lender and lendee in order to escape liability and to greatly reduce a most costly type of litigation.

In our opinion, the narrower "minor deviation" and "conversion" rules followed by some jurisdictions, which make coverage turn on scope of the permission given in the first instance, render coverage uncertain, foster unnecessary litigation, and do not comport with our state's legislative policy of assuring an available fund for the innocent victims of automobile accidents.

*Norton v. Lewis,* 623 So.2d 874, 875 (La. 1993) (citations omitted).

[¶ 18] There remains, however, an important distinction between Maine's current financial responsibility statute and the statutes in those jurisdictions that have adopted the initial permission rule. Unlike those states' laws, our statute does not mandate that automobile insurance policies include omnibus insurance coverage. *Compare* 29–A M.R.S. §§ 1601, 1605, *with*

*Commercial Union Ins. Co. v. Johnson,* 294 Ark. 444, 745 S.W.2d 589, 590, 595 (1988) (applying initial permission rule and citing to ·state statute that requires omnibus insurance coverage), *and U.S. Fid. & Guar. Co. v. Fisher,* 88 Nev. 155, 494 P.2d 549, 551–52 (1972) (same), *and Progressive N. Ins. Co. v. Concord Gen. Mut. Ins. Co.,* 151 N.H. 649, 864 A.2d 368, 374–76 (2005) (same). As a result, there is no certainty in Maine that omnibus insurance coverage will be available to provide indemnity insurance for an uninsured motorist who operates a vehicle with the permission of the registered owner.

[¶ 19] Although Maine's legislative policy of assuring indemnity protection for the innocent victims of automobile accidents is less robust than in those jurisdictions requiring omnibus insurance coverage, the policy of universal financial responsibility nonetheless now exists and should be accounted for in the way the minor deviation rule is applied. Although we decline to adopt the initial permission rule, we announce that if the party seeking coverage establishes initial permission to use the vehicle, the minor deviation rule then shifts the burden to the insurance carrier to establish that there were explicit limitations placed on the borrower's use of the insured's vehicle to preclude coverage.[5] Pursuant to this approach, it is not sufficient to simply establish that there was an express or implicit description of what the vehicle was to be used for. The party opposing coverage must establish, by a preponderance of the evidence, that the operator of the vehicle breached an express restriction on the scope of permission established at the time permission was granted. This standard better recognizes the reality that, in exchanges of this sort, people are seldom thinking of the insurance consequences of their statements. In the absence of an explicit understanding to that effect, the law should not tilt toward a result where a vehicle is operated without any insurance coverage.

[¶ 20] Having clarified the applicable burdens associated with the minor deviation rule, we vacate the judgment and remand this case for the Superior Court to apply the minor deviation rule as clarified.

The entry is:

Judgment vacated. Remanded for further proceedings consistent with this opinion.

SILVER, J., with whom JABAR, J., joins, concurring.

[¶ 21] I concur in the result but it is time for this Court to adopt the initial permission rule.

[¶ 22] The minor deviation rule eliminates liability insurance for a vehicle when it is used by someone whose use at the time of the accident substantially deviated in purpose, place, and time from the permitted use. *Taylor v. U.S. Fid. & Guar. Co.,* 519 A.2d 182, 184 (Me.1986); *Savage v. Am. Mut. Liab. Ins. Co.,* 158 Me. 259, 263, 182 A.2d 669 (1962). This leads to uneven results and uncertainty for litigants.

[¶ 23] Our decisions applying the minor deviation rule illustrate the problems it presents. In *Johnson v. American Automobile Insurance Co.,* an employee of the owner of a vehicle was permitted to take the vehicle home to wash and polish it, but not to use it for personal errands. 131 Me. 288, 290, 161 A. 496 (1932). The Court held that the employee's act of driv-

---

**5.** Regardless of whether the concurring opinion's cost-benefit analysis regarding the adoption of the initial permission rule is sound, that analysis is best undertaken by the Legislature, and not the Court.

ing the car in the opposite direction a few miles, to an aunt's house, then to a neighbor's, then for an errand, was not a minor deviation, and therefore there was no consent and no coverage. *Id.* at 290, 293, 161 A. 496. In *Savage,* the owner gave consent for the driver to borrow the car for ninety minutes in the morning to do a personal errand in the same town where the owner lived, but the court held the driver's act of keeping the car until that evening and driving it several miles from the owner's home was not a minor deviation. 158 Me. at 260–61, 264, 182 A.2d 669. In *Allstate Insurance Co. v. Lyons,* the owner gave his son permission to use the car, but explicitly withheld permission for anyone else to drive it. 400 A.2d 349, 350 (Me.1979). In spite of the owner's express prohibition, the Court held that the son's use of the car, which consisted of the son's friend driving it, was within the scope of his father's permission, because the friend was "operating" the vehicle, but not "using" it in a manner inconsistent with the owner's permission. *Id.* at 352–53. In *Taylor,* the court found that the owner gave consent for its employee to drive the car to and from work, but the use of the car by the employee's live-in cousin, for social reasons after drinking alcohol, without the employee's knowledge or permission, was not a minor deviation, and therefore there was no consent and no coverage. 519 A.2d at 183–84.

[¶ 24] These holdings illustrate that under the minor deviation rule, the availability of insurance hinges on several factors that are likely to be completely tangential to the basic facts relevant to the accident itself, including (1) the type of errand for which the permitted driver was using the car, (2) the location of the car relative to any geographical restriction on the permission, and (3) the time of the accident relative to any temporal restrictions placed on the permission. This rule renders the litigation costly and restricts coverage in a manner that is contrary to the broad public policy underlying the mandate in 29–A M.R.S. § 1601(1)(2011) that all vehicles required to be registered in Maine be covered by automobile liability insurance.

[¶ 25] The "initial permission" rule provides that "once permission to use [an insured] vehicle is given in the first instance, any subsequent deviation is wholly immaterial and will not defeat coverage under an omnibus clause." *Progressive N. Ins. Co. v. Concord Gen. Mut. Ins. Co.,* 151 N.H. 649, 864 A.2d 368, 375 (2005) (alteration in original) (quotation marks omitted). Under the initial permission rule, "[c]overage is defeated only where 'the deviation from the permitted use rises to the level of theft or conversion.'" *Id.* (quoting *Wiglesworth v. Farmers Ins. Exch.,* 917 P.2d 288, 291 (Colo.1996)).

[¶ 26] Courts and commentators have provided policy reasons for adopting the initial permission rule rather than the minor deviation rule or the strict rule. For example, the initial permission rule "effectively furthers the state's policy of compensating and protecting innocent accident victims from financial disaster" and "the rule greatly reduces a most costly type of litigation." *Progressive,* 864 A.2d at 375 (quotation marks omitted); *see also Mitchell v. Allstate Ins. Co.,* 244 S.W.3d 59, 64–65 (Ky.2008). Even utilizing the burden shift announced by the majority, the minor deviation rule fails to support these policies.

[¶ 27] Most significantly, the minor deviation rule does not sufficiently protect accident victims because the insurance does not follow the vehicle. Generally, states with compulsory insurance statutes favor the initial permission rule "because it implements an underlying legislative policy

that, for the protection of the public, liability insurance should follow the automobile under nearly all circumstances." *Savage,* 158 Me. at 263, 182 A.2d 669; *but see generally Blair v. Travelers Ins. Co.,* 291 Mass. 432, 197 N.E. 60 (1935) (adopting the minor deviation rule despite being a compulsory liability state).

[¶ 28] When the Court originally adopted the minor deviation rule Maine was not a compulsory insurance state. As the majority outlined, times have changed. Maine is now a compulsory insurance state. With this change, accident victims should be able to expect that the vehicle that hit them is insured, and rely on its insurance for damages. In order to consistently protect accident victims the insurance must follow the vehicle, regardless of the permitted, or excluded, use.

[¶ 29] Additionally, the initial permission rule is more effective than the minor deviation rule at avoiding endless litigation. "Litigation as to the scope of the permission—the purpose, the time, or place of use—and similar issues should not be permitted or encouraged." *Barry v. Tanner,* 250 Neb. 116, 547 N.W.2d 730, 733 (1996). The majority's minor deviation rule leaves open the question of scope, which can subject parties to expensive litigation. The less malleable initial permission rule better protects accident victims from this litigation.

[¶ 30] Adoption of the initial permission rule would affect both insurers and the insured. See Savage, 158 Me. at 264, 182 A.2d 669 (discussing the impact on premiums). The rule requires insurers to accept the higher risk of paying for negligent drivers operating vehicles for impermissible uses. In response, however, insurers can raise rates for policyholders who are more likely to lend their vehicle to negligent drivers. Finally, the narrow issues affecting the initial permission rule would result in lower litigation costs for insurers.

[¶ 31] Although Maine's current financial responsibility statute does not explicitly require automobile insurance policies to include omnibus insurance coverage, this Court should adopt the initial permission rule. Distinguishing between the minor deviation and initial permission rules is a judicial act that this Court has previously performed. In *Johnson,* without the assistance of a legislative act, this Court adopted the minor deviation rule. 131 Me. at 292–93, 161 A. 496; *see also Savage,* 158 Me. at 263–64, 182 A.2d 669 (clarifying Maine's adoption of the minor deviation rule); *Arndt v. Davis,* 183 Neb. 726, 163 N.W.2d 886, 889–90 (1969) (adopting the initial permission rule without statutory guidance). Additional judicial action is needed to reflect the current policy regarding compulsory insurance coverage. For these reasons, I would adopt the initial permission rule.