MAINE SUPREME JUDICIAL COURT                                   Reporter of Decisions
Decision:     2013 ME 46
Docket:       And-12-330
Argued:       April 9, 2013
Decided:      May 9, 2013

Panel:        SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

IN RE M.B. et al.

JABAR, J.

[¶1]  The mother of M.B. and G.W. and the father of M.B. appeal from a judgment of the District Court (Lewiston, *Beliveau, J.*) terminating their parental rights.  The mother and father argue that the court violated the Due Process Clause of the Fourteenth Amendment by (1) issuing an order terminating their parental rights before receiving their post-trial briefs and (2) admitting in evidence statements that M.B. made to the court without counsel for the parents being present.  Additionally, the parents argue that the evidence presented at trial was insufficient to prove by clear and convincing evidence that they are unfit to parent and that termination of parental rights is in the best interests of the children.  We affirm the trial court's judgment.

## I.  BACKGROUND

[¶2]  M.B. was born on February 22, 2004.  The mother has a second child, G.W., who was born on August 8, 2008.  At the time of M.B.'s birth, the mother

and father lived together in Florida, but they separated two months later. M.B. remained in Orlando with the mother, and the father moved to Miami but maintained contact and had visits with M.B.

[¶3] In 2008, when the mother dropped M.B. off at the father's home for an overnight visit, the father noticed bruising on the child's arms and legs. Concerned that the bruises were not the result of an accident or play, the father called the mother to determine the cause, but she refused to provide an explanation. Instead, hours later, at 3:00 a.m., the mother arrived at the father's home and frantically demanded that the father hand over M.B., which he did.

[¶4] Despite concerns about M.B.'s safety, the father did not contact Florida authorities or attempt to obtain custody. He did maintain contact with the mother and occasionally spoke with M.B., but the father did not see his child after this early morning incident, and, for the first fifteen months of this case, he did not have any contact with the child, believing the mother's untruthful assertions that the child was around but too busy to talk.[1] Soon after G.W. was born, the mother moved with the children to Massachusetts.

[¶5] On October 2, 2009, the Maine Department of Health and Human Services received information indicating that the mother had fled to Maine because

---

[1] When asked about whether he thought M.B. was in danger while with the mother, the father stated, "He had the bruises, and I was mad, but [I did] not [think] that she was going to kill him or anything."

the Massachusetts Department of Children and Families was attempting to take custody of M.B. and G.W. The Department was concerned because the mother had been substantiated as a sex offender in Massachusetts for allegedly inserting a toothbrush into the vagina of her boyfriend's two-year-old daughter, had untreated substance abuse and mental health issues, and exposed her children to domestic violence. A caseworker with the Department met with M.B. at school, where he indicated that he was hungry and that he had recently come to Maine with his sister, his mother, and his mother's boyfriend. The caseworker also met with the mother separately. She denied the allegations of sexual abuse relayed from Massachusetts and indicated that she had forgotten to feed M.B. that day. While at the meeting, the mother changed G.W.'s diaper and the caseworker noticed blood in the child's stool. Later that same day, the children were taken into the Department's custody and placed with a foster family. Soon thereafter, G.W. was examined by Dr. Lawrence Ricci of the Spurwink Child Abuse Program, who determined that she had suffered "anal injuries consistent with blunt penetrating trauma."

[¶6] On October 15, 2009, the mother waived her right to a summary preliminary hearing; the court reaffirmed the children's custody with the Department and recognized that service was incomplete as to the father. The mother indicated that she believed the father was in Florida but denied knowing

4

how to contact him; she denied knowing the identity of G.W.'s father, claiming that G.W. was the product of rape.

[¶7]  The court entered an agreed-upon jeopardy order as to the mother in February 2010, requiring her to engage in a variety of services approved by the Department including a psychological evaluation, mental health counseling, and random drug and alcohol testing.  The children were ordered to remain in foster care, and the father's whereabouts were still unknown.

[¶8]  Judicial review conferences were held on April 29, 2010, and July 15, 2010, at which the court found that jeopardy as to the mother was unresolved because she had been living in Massachusetts[2] and the extent of her participation in Department-approved services was unknown.

[¶9]  At the time of the third judicial review conference, held on October 26, 2010, the mother had returned to Maine and was participating in some substance abuse and mental health counseling, but she continued to test positive for marijuana use.  The court found that the mother had made little progress regarding her chaotic lifestyle or the issues surrounding sexual and physical abuse to her children.  By that date, more than a year after M.B. was placed in the State's

---

[2]  In November 2009, the mother was convicted in Massachusetts of possession of crack cocaine with intent to distribute.  At the time of the July 15, 2010, judicial review conference she was still on probation for that conviction.

custody, the State had not yet served any of the originating documents on the father.

[¶10]  On February 3, 2011, a Department caseworker was contacted by the father.  According to the father, the mother had only recently informed him that M.B. was in the Department's custody.  On February 11, 2011, the Department filed a petition to terminate the parental rights of both the mother and the father.

[¶11]  In June 2011, the Department dismissed the petition to terminate the father's parental rights and the court (*Stanfill, J.*) entered an agreed-upon jeopardy order as to him; a hearing on the petition to terminate the mother's parental rights was continued.  In August 2011, after a judicial review conference, the parties developed a reunification plan for M.B. and the father, which indicated that the father, who at the time still lived in Florida, would begin contacting M.B., then seven years old, via email.  At the conference, the mother refused to sign a reunification plan and refused to submit to drug testing.

[¶12]  Pursuant to the reunification plan, contact between M.B. and the father began through email.  Even this limited contact, however, caused extreme anxiety in M.B. and stress to the father.  In the emails, M.B. would tell his father that he hated him and that he did not want to talk to him.  M.B. refused gifts that his father bought him and drew pictures depicting his father being hurt; the father suffered a medical event—his girlfriend characterized it as a heart attack—that he

6

claimed was related to the stress of interacting with M.B. As a result of the father's medical condition, email contact between the father and M.B. ceased from November 2011 to February 2012.

[¶13] In December of 2011, over M.B.'s protests, the Department arranged two phone calls between M.B. and the father.[3] Despite M.B.'s reluctance, the first phone call was conducted without incident, and the two talked for about five minutes. When the foster mother took M.B. to the Department's office for a second phone call, however, "he was laughing insatiably [*sic*], and crying," and eventually curled up on his knees on the floor. After the second phone call, M.B. began screaming in the middle of the night and having hallucinations. The phone calls then ceased.

[¶14] Meanwhile, the Department was attempting to convince the father to move to Maine to help facilitate reunification. Instead, the father moved to New York to live with his girlfriend and the two other children he has with her. The father did begin to meet with George Repp, a reunification therapist located in Maine, but was unable to keep his once-a-month appointments, and Repp eventually discharged him. Although Repp suggested that the father attempt to

---

[3] With regard to the phone calls, the foster mother testified that M.B. "was crying. He was very adamant, stood his ground, and just—he did not want to do it."

receive reunification services from a therapist in New York, neither the father nor the Department ever pursued that option.

[¶15]  On February 6, 2012, the Department filed a petition to terminate the parental rights of the mother and the father.  With respect to the mother, the Department alleged that she missed meetings and scheduled visitations, failed to consistently engage in substance abuse and mental health treatment, and failed to understand why her children had been removed from her care.  The Department alleged that contact with the father caused M.B. extreme anxiety and that the father refused to put M.B.'s needs for permanency above his own.  The court held a hearing on the petition on May 29 to 31, 2012.

[¶16]  At the termination hearing, Julia Cabral, a licensed clinical social worker who worked with M.B., testified that the increased contact between M.B. and the father caused M.B. to feel that "his safety was threatened," and indicated that on two instances, when faced with the prospect of contacting his father, M.B. would laugh, then cry, and curl up in a ball on the floor of her office.  She also indicated that M.B. has made it clear that he considers his foster family his real family, he is extremely fearful of being taken away from that family, and, in her clinical opinion, removal from the foster family's home would result in "a significant disruption of his developmental progress."  She stated that M.B. needed finality in a short period of time.

[¶17]  Mark Rains, a licensed psychologist who conducted an evaluation of M.B., testified that M.B. demonstrated signs of posttraumatic stress disorder and that he made little progress on this front in therapy because of the uncertainty associated with his future living situation.  Rains also testified that it "would be probably many months to a year or two" before M.B. and the father could establish a meaningful relationship, and, in his opinion, M.B. could not wait that long to have his permanency needs met.  Based on the testimony of Cabral and Rains, the court found that "it would likely take another [six] months to a year to begin reunifying [M.B.] with [f]ather.  Such a timeframe is not reasonably calculated to meet the [c]hild's needs; [M.B.] cannot wait any longer."

[¶18]  Over the father's objection, the guardian ad litem testified that he and M.B. met privately with the court in chambers, without the attorneys for the parties present, and in that meeting M.B. indicated that he would like to live with the foster family.  In response to the father's objection, the court indicated that it thought the parties agreed to the meeting and that regardless, there was other evidence in the record indicating the child's preference to live with the foster family, including the testimony of the child's therapist.  According to the foster mother and M.B.'s therapist, M.B. considers the foster family his "real family," and sees a relationship with his mother and father as a threat to the security he has

experienced with the foster family. The foster parents testified that they would like to adopt both M.B. and G.W.

[¶19] At the conclusion of the hearing, the court indicated that in lieu of closing arguments it would give the parties until June 8, 2012, to file post-trial briefs. On June 6, 2012, the court entered a judgment terminating the parental rights of the mother as to M.B. and G.W., and terminating the parental rights of the father as to M.B. The court concluded that there was clear and convincing evidence that both parents (1) were unwilling or unable to protect the children from jeopardy in a time reasonably calculated to meet their needs, (2) were unwilling or unable to take responsibility for the children within a time reasonably calculated to meet their needs, and (3) had failed to make good faith efforts to reunify.

[¶20] The court found that the Department made "diligent and reasonable efforts to rehabilitate and reunify [the] family," but that the mother failed to comply with the reunification plan and continued to pose a threat to the children. Similarly, the court found that the "[f]ather's complete lack of concern for the well being of his child and his failure to take action" between the time the mother took M.B. from Florida and the time he entered the case was "unacceptable" and "exceptionally unjustifiable." As evidence of the father's lack of concern, the court noted that despite noticing bruising and being concerned for M.B.'s well-being the last time he saw the child, "for a period of at least [fifteen] months,

but probably longer . . . [the f]ather simply took [the m]other's word that his son was busy. He neither saw nor spoke to his child." Further, based on progress the children made in foster care, the court found that termination of parental rights as to both parents was in the best interests of the children.

[¶21] With regard to the mother, the court's findings of jeopardy and failure to take responsibility stemmed from her substance abuse, unstable lifestyle, and failure to address the issues that sparked the Department's initial involvement; the court found that her efforts to reunify were "sporadic and minimal."

[¶22] Similarly, with regard to the father, the court found that he failed "to maintain a meaningful contact with the [c]hild pursuant to the [r]eunification [p]lan, and failed to seek and utilize appropriate services to assist in rehabilitating and reunifying with the [c]hild." The court found that when the father moved from Florida to New York, the Department "made efforts to overcome" the physical distance between M.B. and the father, but the "[f]ather did not put in his share of the effort." The court also found that "interaction with [f]ather still poses a threat to [M.B.'s] safety and security."

[¶23] The court found that although the father was a competent parent for his other two sons, "the ability of a parent to take responsibility for a child is not based on the ability to take care of *any* child, but of the child who is the subject of the proceedings." Therefore, despite the father's willingness to care for M.B.,

"given [M.B.]'s negative feelings toward [the f]ather and the complete lack of relationship between the two, [the f]ather is unable to provide [M.B.] with the care he needs." The court concluded that "any longer of a wait is not a reasonable time to meet [M.B.'s] needs" and "[t]he Permanency Plan as to both [c]hildren is adoption." Both parents timely filed notices of appeal. *See* 22 M.R.S. § 4006 (2012); M.R. App. P. 2(b)(3).

## II.  DISCUSSION

[¶24]  Both parents argue (A) that the court violated their rights pursuant to the Due Process Clause of the Fourteenth Amendment of the United States Constitution and article 1, section 6-A of the Maine Constitution by (1) issuing a decision prior to receiving their post-trial briefs and (2) interviewing M.B. off the record and without the parents' attorneys being present in violation of 22 M.R.S. § 4007(2) (2012), and (B) that the court erred in terminating their parental rights.

A.    Due Process

[¶25]  "[T]he liberty protected by the Due Process Clause includes the right of parents to establish a home and bring up children . . . ." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (quotation marks omitted).  Thus, "[w]hen the state seeks to terminate the relationship between a parent and child, it must do so by fundamentally fair procedures that meet the requisites of due process."  *In re Alexander D.*, 1998 ME 207, ¶ 13, 716 A.2d 222.  "The

fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right which the particular pertinent constitutional provision purports to protect." *Id.* (quotation marks omitted).

### 1. Closing Argument

[¶26] The parents argue that the court violated due process by issuing the judgment before receiving the post-trial briefs for two reasons: first, although M.R. Civ. P. 51(a) gives trial courts discretion to shorten the time for argument, it does not allow the court to decide not to receive argument at all; and second, because the court in this case specifically allowed time for argument, it was error to issue the decision prior to the deadline for filing post-trial briefs. We review questions of law, including "issues of statutory and constitutional interpretation[,]" de novo. *In re D.P.*, 2013 ME 40, ¶ 6, --- A.3d --- (quotation marks omitted). We also review de novo "a court's interpretation of the Maine Rules of Civil Procedure." *Town of Poland v. T & M Mortgage Solutions, Inc.*, 2010 ME 2, ¶ 6, 987 A.2d 524.

[¶27] Maine Rule of Civil Procedure 51(a) provides that "[c]ounsel for each party shall be allowed such time for argument as the court shall order." We have stated that rule 51(a) provides "that a court may in its discretion hear argument, but this provision does not provide parties the opportunity to argue as a matter of

right." *Coppersmith v. Coppersmith*, 2001 ME 165, ¶ 7, 786 A.2d 602. Arguing that this interpretation is contrary to longstanding precedent and the plain language of rule 51(a), the parents urge us to clarify *Coppersmith* to mean that closing arguments are mandatory. We decline to do so.

[¶28] Here, the court indicated that although it had received all of the information that it needed to render a decision, it would allow time for the parties to file post-trial briefs. Instead, the court issued its decision two days before the deadline it set for receiving those briefs. Still, the record reveals that rather than asking the court, in light of closing arguments, to alter or amend the judgment pursuant to M.R. Civ P. 59(e), or to reconsider the judgment pursuant to M.R. Civ. P. 60(b), the parents appealed directly to this Court. *See Jim Mitchell & Jed Davis, P.A. v. Lavigne*, 2001 ME 67, ¶ 5, 770 A.2d 109 ("It would be inconsistent with the doctrines of deferential review or judicial economy, and any of the exceptions to the final judgment rule, to permit a direct appeal . . . to proceed without the objecting party first having utilized the available opportunity to secure prompt consideration by the trial court of any objections they may raise.").

[¶29] Although the parents had avenues through which they could have sought immediate redress from the trial court, they chose to proceed directly to this Court, and they did so without alleging how the purported error affected the underlying judgment. *See In re A.M.*, 2012 ME 118, ¶ 25, 55 A.3d 463; *see also*

*Greaton v. Greaton*, 2012 ME 17, ¶ 7, 36 A.3d 913. The parents failed to avail themselves of mechanisms through which the trial court could have provided relief, *see* M.R. Civ. P. 59(e), 60(b), failed to demonstrate how the outcome would have been different had the court considered their briefs, *see In re A.M.*, 2012 ME 118, ¶ 25, 55 A.3d 463, and they are not entitled to closing argument "as a matter of right," *Coppersmith*, 2001 ME 165, ¶ 7, 786 A.2d 602. They were provided "notice of the issues, an opportunity to be heard, the right to introduce evidence and present witnesses, the right to respond to claims and evidence, and an impartial fact[-]finder." *In re Kristy Y.*, 2000 ME 98, ¶ 7, 752 A.2d 166 (footnotes omitted); *see In re A.M.*, 2012 ME 118, ¶ 27, 55 A.3d 463. Therefore, we conclude that the court did not violate the parents' due process rights by entering the judgment terminating their parental rights prior to receiving their post-trial briefs. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1975) (providing the three factors that must be evaluated to determine whether a state has violated an individual's right to due process).

2.      Child Interview

[¶30] The parents argue that the court violated their rights to due process by admitting evidence of statements M.B. made to the court in chambers without the attorneys for the parents present. The State argues that the court had discretion, pursuant to 22 M.R.S. § 4007(2), to take the testimony off the record, and,

alternatively, that the parents fail to point out how any purported error prejudiced them.

[¶31]  Although the record indicates that there was some agreement between the parties that M.B. would be interviewed by the court, the nature and extent of that agreement is unclear.  The court indicated that it was under the impression that the parents consented to the interview, while the parents maintain that they were unaware that the interview was going to take place with the court and GAL alone.  The court took statements from M.B. with only the GAL and the judge present; that interview is not part of the record.  Over the father's objection, the court allowed the GAL to testify as to the child's preference for staying with the foster family, which the GAL indicated that he learned during the child's interview with the judge.  In response to the father's objection, the court stated, "I'll give it whatever weight—I mean, I speak to a lot of kids, and I give what they say certain weight and not much weight sometimes. . . . I have enough evidence . . . that indicates what his preference is at this point."

[¶32]  We note from the outset that the best practice is to follow the strict confines of 22 M.R.S. § 4007(2), regardless of the existence of any contrary agreement by the parties.  Pursuant to section 4007(2),

> [t]he court may interview a child witness in chambers, with only the guardian ad litem and counsel present, provided that the statements made are a matter of record.  The court may admit and consider oral

> or written evidence of out-of-court statements made by a child, and may rely on that evidence to the extent of its probative value.

We have held that the introduction of evidence pursuant to 22 M.R.S. § 4007(2), as applied in *In re Robin T.*, 651 A.2d 337, 338 (Me. 1994) and *In re Charles Jason R.*, 572 A.2d 1080, 1081-82 (Me. 1990), does not violate due process. We have not, however, had an occasion to decide whether, in admitting testimony obtained in a manner not prescribed in section 4007(2), the court violates the statute or due process. "Questions of law, including statutory interpretation, are reviewed de novo." *In re Alivia B.*, 2010 ME 112, ¶ 7, 8 A.3d 625.

[¶33] The plain language of 22 M.R.S. § 4007(2) indicates two alternatives pursuant to which a court may admit out-of-court statements of children in protection proceedings: (i) by interviewing the child with the GAL and counsel present, then making the statements made during the interview part of the record; or (ii) by admitting oral or written out-of-court statements. Here, the court interviewed the child without counsel present and did not make that interview part of the record. Because the statute makes clear that if the court interviews the child, the GAL and counsel shall be present and the interview shall be made a part of the record, taking the statements without counsel and off the record likely violates 22 M.R.S. § 4007(2).

[¶34] Nevertheless, we need not decide whether the violation of 22 M.R.S. § 4007(2) violated the parents' due process rights, because the parents fail to demonstrate how they were prejudiced by the error, and it is highly probable that admission of the evidence did not affect the judgment. *See In re A.M.*, 2012 ME 118, ¶ 25, 55 A.3d 463 ("The mother's failure to explain on appeal how her absence or the officer's testimony [concerning her absence] could have affected the trial or its outcome is relevant in determining on appeal whether she has been deprived of due process."); *Greaton*, 2012 ME 17, ¶ 7, 36 A.3d 913 ("In appealing a judgment, it is not enough to challenge procedural errors allegedly made by the trial court without also showing actual error in the judgment."); *In re Elijah R.*, 620 A.2d 282, 285 (Me. 1993) ("Even though the records are inadmissible hearsay, however, their admission in evidence is harmless error because under the circumstances it is highly probable that admission of the evidence did not affect the judgment."). Even assuming that the child made statements prejudicial to the parents,[4] there is no evidence in the record that the court considered the child's statements in rendering the judgment, and the record contains ample other evidence indicating M.B.'s preference to stay with his foster family rather than reunite with his parents, including the testimony of his foster

---

[4] Although the GAL testified that during the meeting with the court, the child indicated that he would prefer to stay with the foster family, at oral arguments before this Court, the parents indicated that the true danger of the situation is that there is no record of what the child said. Therefore, for the purpose of our analysis, we will assume that the child made statements prejudicial to the parents.

mother and the licensed clinical social worker. *See In re Elijah R.*, 620 A.2d at 285-86 (holding that admission of inadmissible evidence was harmless when the information was "duplicated by other sources in the record"); *cf. In re Morris D.*, 2000 ME 122, ¶ 7, 754 A.2d 993 (holding that it was not an abuse of discretion for a court to refuse to allow a child to testify when the parties, pursuant to 22 M.R.S. § 4007(2), introduced other evidence indicating the child's preference regarding future placement). Therefore, no violation of the parents' due process rights resulted from the court's interview of the child off the record and without the attorneys for the parents present. *See In re A.M.*, 2012 ME 118, ¶ 25, 55 A.3d 463.

B. Termination of Parental Rights

[¶35] The parents challenge the sufficiency of the evidence supporting the court's findings of unfitness and best interest of the children: the father argues that the evidence was insufficient to find that he is unfit and that termination of his parental rights is in the best interest of M.B., and the mother argues that the court erred in finding that the Department made a good faith effort to reunify her with her children.

1. Father's Parental Rights

[¶36] The father challenges the court's findings of parental unfitness. Specifically, he argues that because he did everything required of him in the reunification plan, and because the Department failed to provide a proper

reunification therapist, the court erred in finding that he failed to make a good faith effort to reunify pursuant to 22 M.R.S. § 4041(1-A)(B) (2012). Similarly, he challenges the court's findings that he was unable to protect the child from jeopardy and unable to take responsibility for the child within a time reasonably calculated to meet the child's needs. He also challenges the court's determination that termination was in the best interest of the child.

[¶37] Where the court finds multiple bases for unfitness, we will affirm if any one of the alternative bases is supported by clear and convincing evidence.[5] *See In re Thomas D.*, 2004 ME 104, ¶ 38, 854 A.2d 195. "When the burden of proof at trial is clear and convincing evidence, our review is to determine whether the fact-finder could reasonably have been persuaded that the required findings were proved to be highly probable." *Adoption of L.E.*, 2012 ME 127, ¶ 11, 56 A.3d 1234 (quotation marks omitted). With regard to the best interest determination, we review the court's factual findings for clear error, *see id.*, but its ultimate conclusion for an abuse of discretion, "viewing the facts, and the weight to be given them, through the trial court's lens," *In re Alivia B.*, 2010 ME 112, ¶ 12, 8 A.3d 625.

---

[5] The father persuasively argues that the court erred in finding that he failed to make a good faith effort to rehabilitate and reunify. Nevertheless, we need not address that issue because there is ample evidence in the record supporting an alternative basis of unfitness. *See In re Leona T.*, 642 A.2d 166, 168 (Me. 1994).

[¶38] The court found that the father's "failure to take action during a 15-month period in which he did not speak to or see the [c]hild even once is unacceptable . . . especially in light of his suspicions that the [c]hild was being physically harmed." According to the court, as a result of his inaction, the father is unable to protect M.B. from jeopardy and those circumstances are unlikely to change within a time reasonably calculated to meet M.B.'s needs. Supporting these findings, the record demonstrates that after M.B. was taken from the father's home in 2008, the mother exposed him to a chaotic and dangerous lifestyle, and the father failed to make an effort to ensure M.B.'s safety. Cabral, the licensed clinical social worker who worked with M.B., testified that the child once asked her, "If he was my [d]ad, why wasn't he around when bad things were happening to me?"

[¶39] Further, there is competent evidence in the record to support the court's finding that it would take six months to a year for the father and M.B. to begin to have a relationship. M.B. has been living with the foster family for over three years and has not seen his father since 2008. Given the extreme anxiety M.B. demonstrated when faced with interaction with his father and the threat of removal from his current home, it is highly probable that six months to one year is not reasonably calculated to meet M.B.'s needs. *See In re Charles G.*, 2001 ME 3, ¶ 7, 763 A.2d 1163 (noting that the time frame is calculated from the child's

perspective); *see also In re Colby E.*, 669 A.2d 151, 152 (Me. 1995) ("[T]he emotional difficulties that may attend foster care are included within the statutory definition of jeopardy. We have previously upheld a finding of jeopardy when a child, already vulnerable from earlier abuse and instability, faced developmental regression of serious magnitude if removed from his stable foster home." (quotation marks omitted)).

[¶40]   Additionally, the court's findings regarding the developmental progress that M.B. has demonstrated with the foster family and the foster family's intent to adopt the children are supported by competent evidence in the record, the findings are not clearly erroneous, and the court did not abuse its discretion in finding that termination of parental rights is in the best interest of the child. *See In re Alivia B.*, 2010 ME 112, ¶¶ 12-13, 8 A.3d 625 (noting the substantial deference afforded the trial court regarding best interest determinations).

2.    Mother's Parental Rights

[¶41]  The mother does not directly challenge the court's findings regarding unfitness and best interest of the children but instead argues that the court erred in finding that the Department made a good faith effort to rehabilitate and reunify her with her children. Although the court found "by clear and convincing evidence that [the Department] . . . made diligent and reasonable efforts to rehabilitate and reunify this family . . . [and] pursu[ed] other permanency plans," the mother argues

22

that by frequently changing caseworkers and denying her needed services, the Department failed to make reasonable reunification efforts.

[¶42]  When evaluating parental unfitness, the court should consider any failure on the part of the Department to provide reasonable reunification services. *See In re Thomas D.*, 2004 ME 104, ¶ 28, 854 A.2d 195.  Here, however, the record fully supports the court's finding that the Department made diligent and reasonable efforts to rehabilitate and reunify the mother with her children, and in any event the Department's failure to provide such services does not preclude the court from terminating parental rights, *see id.*

[¶43]  Furthermore, even assuming for the purpose of the unfitness analysis that the Department failed to provide reasonable reunification services, the court's findings of unfitness as to the mother are amply supported in the record: she was substantiated as a sex offender in Massachusetts; G.W. displayed signs of sexual abuse; M.B. displayed symptoms of posttraumatic stress disorder and recalled feeling unsafe in the care of his mother; and the mother continued to engage in substance abuse and maintain a chaotic lifestyle.  *See In re Doris G.*, 2006 ME 142, ¶¶ 15-17, 912 A.2d 572 (affirming the termination of a father's parental rights despite the Department's failure to develop a written reunification plan because the "father's rights . . . were not terminated for failure to engage in and complete any specific undisclosed services, but rather because of the father's

inability to adequately care for, protect, and nurture his children"). Further, the record supports the court's finding that termination is in the best interest of the children. *See id.* ¶ 18. Therefore, the court did not err in finding that the mother is unfit or that the termination of her parental rights is in the best interest of the children.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Jason Dionne, Esq., Isaacson & Raymond, P.A., Lewiston, for appellant father

Richard Charest, Esq., Auburn, for appellant mother

Janet T. Mills, Attorney General, and Nora Sosnoff, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

**At oral argument:**

Jason Dionne, Esq., for appellant father

Richard Charest, Esq., for appellant mother

Nora Sosnoff, Asst. Atty. Gen., for appellee Department of Health and Human Services