MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2017 ME 220
Docket:      Pen-17-237
Argued:      October 11, 2017
Decided:     November 30, 2017

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

ADOPTION OF ISABELLE T. et al.

PER CURIAM

[¶1]  The father of Isabelle and Abigail T. appeals from a judgment of the Penobscot County Probate Court (*M. Bradford*, *J.*) terminating his parental rights in anticipation of an adoption pursuant to 18-A M.R.S. §9-204(b) (2016); 22 M.R.S. §4055(1)(A)(2), (B)(2)(a), (B)(2)(b)(i), (B)(2)(b)(iii), and (1-A)(B)(8) (2016).  He challenges the sufficiency of the evidence to support the judgment, including the court's findings of parental unfitness and that termination of his parental rights is in his children's best interests.  *See* 18-A M.R.S. § 9-204(b); 22 M.R.S. § 4055(1)(B)(2), (1-A)(B)(8).

[¶2]  Because the record, in a case where fundamental constitutional rights are at issue, does not include sufficient evidence regarding parental unfitness, the best interests of the children, and the history of the prospective adopting parent, because the court improperly excluded the father's testimony regarding his future plans for reunification with his children, and

because the court erred and abused its discretion in concluding that termination of the father's parental rights is in the children's best interests, we vacate the judgment.

## I. LEGAL STANDARDS FOR TERMINATING PARENTAL RIGHTS INCIDENT TO ADOPTION

[¶3] Examination of the issues in this appeal must begin with a review of the substantive and procedural requirements for a termination of parental rights incident to an adoption proceeding. When a private individual invokes court action to terminate parental rights or otherwise significantly limit a parent's rights to parent a child, the court engages in state action that implicates the constitutionally protected liberty interest a parent has in parenting his or her child free from state interference.

A. Constitutional Requirements

[¶4] "The liberty interest . . . of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests . . . ." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). We have consistently recognized that a biological parent has a fundamental liberty interest in parenting his or her child. *Adoption of Tobias D.*, 2012 ME 45, ¶ 9, 40 A.3d 990. The Due Process Clause of the Fourteenth Amendment protects

this liberty interest from unnecessary state interference.[1]  U.S. Const. amend. XIV, § 1; Me. Const. art. I, § 6-A; *see Troxel*, 530 U.S. 57, 66 (2000) ("[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (to interfere with a parent's fundamental right to parent, the state must provide fundamentally fair procedures).

[¶5]  These requirements apply to actions in state courts, including the probate courts.  *See Guardianship of Chamberlain*, 2015 ME 76, ¶ 23, 118 A.3d 229 (extensively discussing application of proper standards to protect fundamental parental rights in probate court proceedings affecting parental rights—there in a guardianship proceeding).  *See also In re H.C.*, 2013 ME 97, ¶ 11, 82 A.3d 80; *In re Randy Scott B.*, 511 A.2d 450, 453 (Me. 1986).

[¶6]  The fundamental right to parent one's child is not, however, immune from government interference.  *See Pitts v. Moore*, 2014 ME 59, ¶ 12, 90 A.3d 1169 (action to establish de facto parent status); *Rideout v. Riendeau*,

---

[1]  The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. Article 1, § 6-A of the Maine Constitution similarly provides that "No person shall be deprived of life liberty or property without due process of law . . . ."

4

2000 ME 198, ¶ 19, 761 A.2d 291 (action to establish grandparents' rights).  A state may interfere with a parent's fundamental right to parent a child when the court makes a finding, by clear and convincing evidence, that the parent is unfit and the child's best interest will be served by state intervention to avoid harm to the child.  *In re Cody T.*, 2009 ME 95, ¶ 25, 979 A.2d 81; *see In re A.M.*, 2012 ME 118, ¶ 16, 55 A.3d 463; *In re Robert S.*, 2009 ME 18, ¶¶ 13-15, 966 A.2d 894.

[¶7]  "When the State does interfere with the fundamental right to parent, we must evaluate that interference with strict scrutiny—the highest level of scrutiny—which requires that the State's action be narrowly tailored to serve a compelling state interest."  *Pitts*, 2014 ME 59, ¶ 12, 90 A.3d 1169.  Pursuant to this standard, only the most exceptional circumstances or risks to a child's welfare allow the state to intrude upon a parent's fundamental right to the care and control of his or her child.  *See id.*; *Rideout*, 2000 ME 198, ¶ 24, 761 A.2d 291.

B.   Adoption and Child Protection Statutes

[¶8]  Section 9-204(b) of the Adoption Act, 18-A M.R.S. §§ 9-101 to 9-315 (2016), which governs termination of parental rights in adoption proceedings, incorporates by reference 22 M.R.S. §§ 4050–4059 (2016), which

governs termination of parental rights in child protection proceedings. 18-A M.R.S. § 9-204(b) (2016). Thus, the same statutory protections and requirements that apply to state-initiated proceedings to terminate parental rights also apply to privately initiated proceedings to terminate parental rights. *See Adoption of Lily T.*, 2010 ME 58, ¶ 20, 997 A.2d 722; *In re Jacob B.*, 2008 ME 168, ¶ 13, 959 A.2d 734.

[¶9] The Adoption Act provides that "[a] petition for termination of parental rights may be brought in Probate Court in which an adoption petition is properly filed as part of that adoption petition . . . ." 18-A M.R.S. § 9-204(a).[2] In practice, this means that the termination of parental rights occurs prior to the adoption in order to enable the child or children to be legally available for adoption. *See Adoption of Hali D.*, 2009 ME 70, ¶ 1, 974 A.2d 916. This is consistent with practice in Title 22 proceedings for the termination of parental rights where the court does not begin to consider post-termination placements until after termination of parental rights has been ordered. *See In re Kenneth S.,* 2017 ME 45, ¶ 6, 157 A.3d 244.

[¶10] Thus, theoretically, before the trial court considers the background and the qualities of a prospective adopting parent, the court could

---

[2] Since July 29, 2016, Maine's District Courts have exclusive jurisdiction over adoption actions when there is a case pending in the District Court involving the child or children who are the subject of the adoption. 4 M.R.S. § 152(5-A) (2016); 18-A M.R.S. § 9-103 (2016).

terminate the parental rights of a biological parent. However, in an adoption proceeding, unlike a Title 22 proceeding to terminate parental rights, the prospective adoptive parent is identified. In fact, his or her interest in adoption is the reason the action was initiated. Because the prospective adoptive parent is identified in a Title 18-A private adoption proceeding, the background and qualities of the prospective adoptive parent are essential factors to consider in deciding whether termination of parental rights leading to adoption by that individual is in the best interests of the child or children.[3]

[¶11] There is no state assertion of parental unfitness in private termination/adoption proceedings, and the Adoption Act provides fewer protections for parents than those provided in Title 22 child protection proceedings. Individuals facing the loss of their rights in Title 22 termination of parental rights proceedings are nearly always provided opportunities for rehabilitation and reunification before a court even considers the termination of their parental rights. *See In re Heather C.*, 2000 ME 99, ¶ 4, 751 A.2d 448 ("In the ordinary course, as soon as the child has entered foster care as a result of a court order, the [State] is required to begin providing rehabilitation services to the parents."); *In re Thomas D.*, 2004 ME 104, ¶ 26, 854 A.2d 195

---

[3] We anticipate that this will also be necessary in so-called single parent adoptions. *See* 18-A M.R.S. § 9-301 (2016); *see also Adoption of Liam O.*, 2016 ME 66, ¶ 11, 138 A.3d 485.

("[T]he rehabilitation and reunification plan is the centerpiece of child protective proceedings following a jeopardy determination . . . [and] seek[s] to rehabilitate the conditions that resulted in jeopardy to the child . . . .").

[¶12] The Adoption Act, on the other hand, does not require—or even authorize—the court to consider rehabilitation or reunification efforts prior to terminating parental rights. *See Adoption of L.E.*, 2012 ME 127, ¶ 13, 56 A.3d 1234; *compare* 22 M.R.S. § 4041 (2016) (stating the obligations of the Department of Health and Human Services to pursue rehabilitation and reunification efforts in child protection matters) *with* 18-A M.R.S. § 9-204(b) (incorporating by reference 22 M.R.S. §§ 4050-4059 and not referencing 22 M.R.S. § 4041). A termination action litigated as part of a "private adoption," where the adoption petitioner—often one parent—seeks to terminate the parental rights of a nonconsenting parent to facilitate an adoption, requires only that the petitioner prove that the grounds for termination have been met in order for the court to permanently terminate that parent's legal rights to his or her child. *See Adoption of L.E.*, 2012 ME 127, ¶¶ 12-13, 56 A.3d 1234.

[¶13] In a Title 22 child protection proceeding, the question of termination is addressed only after a court has decided that the parent's

unfitness is so dire that the children must be removed from his or her care. And, even in those circumstances, the parent is nonetheless usually offered multiple opportunities to better his or her parenting abilities and reunify with the children through court-ordered and state-provided services.

[¶14]  In the private adoption context, as is the case here, where there has been no previous determination of unfitness, a parent can have his or her parental rights terminated without any opportunities for rehabilitation or reunification.  Thus, application of the Adoption Act, as written, poses a substantial risk to fundamental parental rights that the court must respect by rigorous application of quality of evidence standards and procedural protections as we have articulated in opinions such as *Guardianship of Chamberlain*, 2015 ME 76, 118 A.3d 229.[4]

[¶15]   In the matter before us, we must consider whether the circumstances leading to this private adoption and termination proceeding

---

[4]  The Adoption Act has been criticized for lacking procedural processes that fully protect a parent's fundamental parental rights.  *See* Deirdre M. Smith, *From Orphans to Families in Crisis: Parental Rights Matters in Maine Probate Courts*, 68 Me. L. Rev. 45, 73-75 (2016) (opining that adoption and termination proceedings brought pursuant to the Adoption Act should require reunification efforts as a prerequisite for terminating parental rights, as it "would impose an affirmative duty on the courts overseeing such [termination proceedings] to ensure that they provide parents a fair opportunity to address their fitness and relationship with their children before a court may permanently dissolve those legal bonds.").

are exceptional enough to justify the termination of parental rights—the most severe interference with the fundamental right to parent.

## II. CASE HISTORY

[¶16]  This appeal involves a private adoption proceeding and petition to terminate the father's parental rights brought by the mother and stepfather of Isabelle and Abigail T.  They seek to terminate the parental rights of the children's biological father so that the children can be adopted by their stepfather.

[¶17]  On May 4, 2016, the mother and stepfather filed a petition to adopt Isabelle and Abigail T. in the Penobscot County Probate Court.  As part of these adoption proceedings, on August, 25, 2016, the mother and stepfather filed a petition to terminate the parental rights of the children's father.

[¶18]  A one-day hearing was held on February 28, 2017.  During the hearing, the father testified that he began his relationship with the mother in 2006.  They married in 2009, and the mother was soon pregnant with their first child, Isabelle.  Throughout the relationship there was tension as a result of the father's dishonesty about jobs, finances, and education, and concerns about unfaithfulness.  Their second child, Abigail, was born in 2012.  At that point, their marriage was "on the rocks."

10

[¶19]  The mother and the father testified that in January 2014, while they were in the process of moving, the family stayed in the home of a family friend.  During the family's stay, the father sexually abused the fifteen-year-old daughter of their family friend.  He was convicted of felony sexual abuse of a minor and incarcerated.  Thereafter, the mother obtained a protection from abuse order against the father on behalf of herself and the children.  As a result, the father has not seen his daughters in person since his incarceration.  The mother divorced the father in February 2015.

[¶20]  The father was released from incarceration in March 2015.  Both the mother and the father testified that, after he was released, the father had weekly phone contact with Isabelle and Abigail for a period of time.  In July 2015, the father was re-incarcerated after violating his probation.  He is now expected to be released in April 2018.

[¶21]  The father testified that he has, to the extent he has been able, attempted to get help to address his problems and has expressed his commitment to maintain a relationship with Isabelle and Abigail.  His efforts to maintain a relationship with his daughters have been complicated by the protection from abuse order and by conditions of probation that limit contact with his children.  When the father inquired about having contact with his

children, he was told by the director of victim services at the prison where he is currently incarcerated that he "cannot have indirect or direct contact with [his] children."

[¶22]   Both the father and the mother testified that throughout the father's incarceration the children have had regular contact with the father's parents.  The mother acknowledged that, because her parents are deceased, the father's parents are the only grandparents the children will ever have.[5] The grandparents see the girls as often as they are able, given travel distances and the children's school schedules.  The grandfather testified that he and his wife are concerned that their "rights as grandparents [would] be diminished" if the father's parental rights were terminated.

[¶23]   The stepfather testified that he has three children from prior relationships: boys ages ten, ten, and eight as of the hearing date.  The stepfather testified that his parental rights to two of his children, one ten-year-old and the eight-year-old, have previously been terminated.  The stepfather further testified that one of the reasons that his parental rights were terminated was his significant alcohol and drug abuse problem.

---

[5]  The stepfather, who is the prospective adoptive parent, testified that his parents are living, but that the girls "will never meet my parents."  His father is in prison in Kentucky, and his mother was recently released from prison.  The record is silent regarding the reasons his parents went to prison.

12

[¶24]  In 2009, near the time when his eight-year-old son would have been born, the stepfather was charged with criminal mischief.  After that charge, the stepfather testified, he turned his life around, became sober, and is now regularly employed.  At some time in this period, the stepfather moved from Kentucky to Maine.  He met Isabelle and Abigail's mother in 2014 and moved in with her and the children in 2015.  The mother testified that she met the stepfather in May 2014, and that they were married in January 2016.  Isabelle and Abigail call him "Daddy," and he is a large part of their everyday lives.

[¶25]  During the mother's and stepfather's direct examinations, they both testified regarding their future plans for Isabelle and Abigail.  When the father was asked about his plans to reestablish a relationship with his children upon his release from prison, the mother objected on the ground that the question called for speculation.  The court sustained the objection and excluded the question.

[¶26]  On April 4, 2017, the court issued an order terminating the father's parental rights.  In the order, the court found:

> [The father's] failure to make any attempt to establish a family relationship with the child, or contribute in any way toward the children's financial support, constitutes clear and convincing evidence that the [father] has been unwilling or unable

to take responsibility for the children within a time reasonably calculated to meet the children's needs.

The court also concluded that termination of the father's parental rights, "thereby freeing the children for adoption by the petitioners, is in the children's best interests."

[¶27] In response to a motion by the father, the court subsequently issued findings of fact and conclusions of law supporting its termination decision, as required by M.R. Civ. P. 52(a). *See also* 22 M.R.S. § 4055(1)(B)(2). The court supported its termination order with the following findings of fact:

> [The father] sexually assaulted the 15-year-old daughter of the close friend he was staying with and has been convicted of felony sexual abuse of a minor.
>
> The minor victim was a child who was a member of a house frequented by [the father].
>
> [The father] is an incarcerated parent who, due to his parole[6] violation, will not be released until April 2018 at the earliest.
>
> Based upon [the father's] conviction and subsequent parole violation, as well as [his] failure to provide any support for or contact with his children, he is unwilling or unable to take responsibility for his children.
>
> [The father] has failed to communicate meaningfully with the child for a period of at least six months (namely almost four years).

---

[6] The record reflects that the father was on probation, not parole.

14

[¶28]  The court's findings also referenced 22 M.R.S. § 4055 and noted that statute's requirement for findings by clear and convincing evidence addressing parental unfitness and the best interest of the child, but the court did not state specific findings on those issues.

[¶29]  The father timely appealed the court's order terminating his parental rights.

### III.  LEGAL ANALYSIS

[¶30]  We review factual findings that termination of parental rights was in the children's best interests for clear error and the ultimate decision to terminate parental rights for an abuse of discretion.  *In re M.B.*, 2013 ME 46, ¶ 37, 65 A.3d 1260; *In re Alivia B.*, 2010 ME 112, ¶ 12, 8 A.3d 625.  We review factual findings that a parent is unfit or otherwise incapable of parenting for clear error and will determine that a finding is unsupported only if there is no competent evidence in the record to support it; if the fact-finder clearly misapprehended the meaning of the evidence; or if the finding is so contrary to the credible evidence that it does not represent the truth of the case. *Guardianship of Hailey*, 2016 ME 80, ¶15, 140 A.3d 478.  In addition, when fundamental rights are at stake, findings may be determined to be insufficient or the court may be found to have erred in the exercise of its discretion if

important issues that arise during trial are not addressed in the record or in the court's findings. *See Sargent v. Braun*, 2006 ME 96, ¶¶ 9-11, 902 A.2d 839 (vacating the trial court's judgment denying a motion to modify parental rights, where the court failed to fully evaluate or provide findings relative to substantial issues affecting the child's best interest, including the mother's relocation and her abusive relationship).

[¶31] In this case, where the prospective adopting parent had a substantial history of substance abuse and had his parental rights terminated as to two of his three biological children, it is concerning that neither of the parties provided details of that history to the court. When a termination is being sought in order to facilitate an adoption, factual information about the prospective adoptive parent—the good and the bad—is vital to the determination of whether termination of a biological parent's parental rights is in the children's best interests.

[¶32] Before the state, acting through the courts, can interfere with the fundamental right to parent by terminating parental rights, due process requires that findings of unfitness be made by clear and convincing evidence. *See Pitts*, 2014 ME 59, ¶ 12, 90 A.3d 1169. Pursuant to the Adoption Act, which incorporates by reference 22 M.R.S. § 4055, the court may order

termination of parental rights, absent parental consent, only if the court finds, by clear and convincing evidence, that (1) the parent (i) is unable to protect the child from jeopardy, (ii) is unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs, or (iii) has abandoned the child; and (2) with unfitness proved, termination of parental rights is in the best interest of the child. *See* 18-A M.R.S. § 9-204(b); 22 M.R.S. § 4055(1)(A), (1)(B); s*ee also In re Scott S.*, 2001 ME 114, ¶¶ 17-21, 775 A.2d 1144 (holding that only if parental unfitness is proved "does the court consider the children's best interests"). "[A]lthough the best interest factor alone may prevent the termination of parental rights, it will never, standing alone, be a basis for a termination." *Id*. ¶ 21.

[¶33] We review the sufficiency of the evidence to determine "whether the court could have reasonably been persuaded on the basis of the evidence in the record that the required factual findings were highly probable." *In re Thomas H.*, 2005 ME 123, ¶ 18, 889 A.2d 297. The father argues that there was insufficient evidence supporting the court's findings of parental unfitness and its ultimate decision to terminate the father's parental rights as being in the best interests of his children.

A.      Issues Related to the Father's Fitness to Parent

1.      Father's Imprisonment

[¶34]   A court may not terminate parental rights based solely on a parent's incarceration.   *See In re Alijah K.*, 2016 ME 137, ¶¶ 13-16, 147 A.3d 1159.  "We agree that a parent's incarceration is but one factor to be considered by a court faced with a termination petition, [although] it is *a factor*—a factor that may, in some cases, lead a court to terminate that parent's rights."  *Id.*  Respecting the strong policies in favor of permanency, a court must consider whether the length of a parent's incarceration will prevent the parent from protecting the child from jeopardy or taking responsibility for the child within a time reasonably calculated to meet the child's needs.   *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i), (ii); *In re Alijah K.*, 2016 ME 137, ¶ 14, 147 A.3d 1159.

[¶35]   Here, the father is currently in prison.  He is expected to be released in April 2018, approximately one year after the termination hearing was held.  He has had no opportunity to receive rehabilitative services, and, as noted earlier, he has been prohibited from having contact with his children.  Given all of the circumstances of this case, we cannot affirm the conclusion that, as the court framed the issue, the fact of his incarceration and lack of

contact with the children will make the father incapable of engaging in parenting of the children after his release.

[¶36] In the private adoption setting, the permanency concerns that are typically present in state-initiated termination proceedings are not at issue. Here, the children are in a permanent living situation with their mother and stepfather, which, as all the parties testified, is not going to change regardless of the outcome of the termination and adoption processes.

2. Protection from Abuse Order

[¶37] "[A] parent's prohibition from contact with a child pursuant to a protection from abuse order or other court order, should not, standing alone, constitute abandonment." *Adoption of Lily T.*, 2010 ME 58, ¶ 21, 997 A.2d 722. Parents subject to protection from abuse orders are obligated to make even greater efforts to foster relationships with their children using the means available to them. *See id.*; *see also Adoption of T.D.*, 2014 ME 36, ¶ 13, 87 A.3d 726.

[¶38] Here, the father has been subject to a protection from abuse order, and also, apparently, conditions of incarceration or probation, limiting his contact with his children. Despite the order in place, the father has made efforts to maintain contact with his children. During his first prison sentence,

he sent letters to his children. After being released, he had weekly phone contact with the children before returning to prison after violating his probation. Upon his re-incarceration, he testified that he sought to include his children in a Christmas gift exchange program and reached out to prison officials to see about contacting his children, only to be told he was not allowed to have direct or indirect contact with them.

[¶39] These actions and the father's own testimony demonstrate his desire and effort to maintain a relationship with his children. Despite all of the barriers in place preventing his contact with the children—the reasonableness of which we do not question here—the record reflects his efforts to maintain a parental relationship with his children. On this record, there is not sufficient evidence supporting the findings of parental unfitness, to the standard of clear and convincing evidence, to justify termination of the father's parental rights.

B.     Issues Related to the Ultimate Determination that Termination of the Father's Parental Rights is in the Best Interests of the Children

    1.     The Court's Exclusion of Testimony Regarding the Father's Plans for Re-establishing Contact with His Children

[¶40] The father argues that the court erred and abused its discretion by sustaining the objection to questioning him regarding his plans to

re-establish a relationship with his children once he is out of prison. The trial court reasoned that the father's testimony concerning his plans would require him to speculate and that it was therefore inadmissible.

[¶41] We review the trial court's determination that the necessary factual foundation to admit evidence has or has not been established for clear error, and its ultimate determination to admit or exclude the evidence for an abuse of discretion. *Levesque v. Cent. Me. Med. Ctr.*, 2012 ME 109, ¶ 16, 52 A.3d 933. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. M.R. Evid. 401; *see also In re M.S.*, 2014 ME 54, ¶ 10, 90 A.3d 443 ("This standard for relevance is a low one.").

[¶42] Measured against this low relevancy standard, the exclusion of the father's testimony regarding his plans to re-establish a relationship with his children was error. The court was required to decide whether the father was "unwilling or unable to protect the child from jeopardy and those circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs" or was "unwilling or unable to take

responsibility for the child within a time which is reasonably calculated to meet the child's needs." 22 M.R.S. § 4055(1)(B)(2)(b)(i), (ii).

[¶43] The father's testimony regarding his plans for re-establishing a relationship with his children was essential to the court's evaluation of whether termination of the father's parental rights would be in the best interests of the children. It is difficult to understand how the court could have decided whether termination of parental rights was in the best interests of the children, a decision that necessarily looks to the future, without hearing the father's testimony regarding his plans for a relationship with his children. The father's testimony regarding his plans for a relationship with his children also was relevant to the court's determination of parental unfitness, specifically whether, looking to the future, the father would be unable or unwilling to protect his children from jeopardy or take responsibility for his children within a time reasonably calculated to meet their needs.

[¶44] The court's error in excluding the father's testimony regarding his plans to reestablish a relationship with his children was not harmless. *See* M.R. Civ. P. 61. An error is reversible and not harmless if a "substantial right" of the party is affected. *See id.*; *In re Joshua B.*, 2001 ME 115, ¶ 10, 776 A.2d 1240. Because the exclusion of this testimony prejudiced the

father's ability to defend his parental fitness and had a direct effect on the father's fundamental right to parent and the children's best interests, the court's error in excluding this testimony, by itself, would require that the judgment be vacated.

2. Lack of Evidence Concerning the Stepfather's Prior Terminations of Parental Rights

[¶45]  The evidence falls materially short of including the records, testimony, or other evidence regarding the prospective adopting parent's past history that should have been considered prior to terminating the father's parental rights.  It is unclear why these records were not disclosed, but they were necessary for the court to have prior to determining the children's best interests.  *See In re Brandon D.*, 2004 ME 98, ¶¶ 13, 15, 854 A.2d 228 (vacating the court's judgment terminating the father's parental rights where the court's lack of findings concerning the children's best interests was in direct proportion to the lack of evidence presented by the prospective adoptive parents).[7]

---

[7]  We have said that "the deprivation of parental rights is in many ways similar to the deprivation of liberty interests at stake in criminal cases."  *In re M.P.*, 2015 ME 138, ¶ 26, 126 A.3d 718.  In a criminal case, the criminal defendant must be afforded a proper opportunity to attack evidence presented against him bearing on his guilt in order to provide the defendant with a fair trial.  *See State v. Ledger*, 444 A.2d 404, 412 (Me. 1982); *State v. Lovely*, 451 A.2d 900, 902 (Me. 1982) (vacating the court's judgment where the court denied the defendant's request for voir dire aimed at a type of bias that was directly intertwined with the charges alleged against him and failed to develop factual circumstances about the request prior to making a judgment).

[¶46] The stepfather briefly testified about his three children from prior relationships and the prior termination of his parental rights as to two of the children. There was also limited testimony regarding the stepfather's struggles with substance abuse. Evidence in the record, however, does not disclose, for example: (i) why the stepfather's rights to two of his three children were terminated; (ii) what was or is the nature of the stepfather's relationship with the mothers of each of his three children; (iii) where the two children, as to whom the stepfather's parental rights were terminated, are now; (iv) whether those two children were placed with individuals with whom the stepfather may have contact; (v) whether issues other than substance abuse, such as domestic violence, contributed to the terminations; and (vi) why parental rights to a younger child were terminated while the father was permitted to maintain limited contact with one of the ten-year-old

---

In criminal cases, where self-defense is an issue essential to the defendant's case, the court's failure to instruct on self-defense deprives the defendant of a fair trial. *State v. Davis*, 528 A.2d 1267, 1270 (Me. 1987). Further, in a post-conviction hearing where the court is asked to evaluate "claims of ineffective [assistance of counsel] arising from trial counsel's failure to present evidence to impeach witnesses who provide incriminating testimony, the court may consider factors such as the strength of the State's case, the effectiveness of the actual defense presentation, and the significance of the impeachment value of evidence that trial counsel failed to develop." *Theriault v. State*, 2015 ME 137, ¶ 30 n.9, 125 A.3d 1163.

Although the present case is not a criminal case, before terminating a parent's fundamental right to parent his or her children in order to permit those children to be adopted by a specific individual, the court cannot determine that adoption is in the children's best interest, to the standard of clear and convincing evidence, without having all of the necessary information about the prospective adoptive parent.

boys. In response to questions at oral argument, we were advised that the two ten-year-old boys had different mothers, but this information was not before the trial court.

[¶47] This case appears to be a matter of first impression in requesting the court to terminate the parental rights of a father so that his children may be adopted by a stepfather who, when he was at about the same age as the father is now, had his parental rights terminated to two of his three children. Were the stepfather facing a state-initiated child protective proceeding, there could be a rebuttable presumption that he is unwilling or unable to protect the children from jeopardy because a "court has previously terminated parental rights to another child who is a member of the same family." *See* 22 M.R.S. § 4055(1-A)(D). Considering the unique nature of this case, it is concerning that neither the parties nor the guardian ad litem presented essential details of the stepfather's prior history or relationships with children to the court.

[¶48] Without sufficient background information and documentation regarding the stepfather's prior terminations of parental rights, we cannot affirm the court's final judgment terminating the father's parental rights. The court could not, without this information, find that termination of the father's

parental rights was in the best interests of his children in order to free the children for adoption by the stepfather. Terminating the father's parental rights without this information was error.

     3.     Best Interests of the Children

[¶49]  In considering the children's best interests, the court is required to consider "the needs of the child[ren], including the child[ren]'s age, the child[ren]'s attachments to relevant persons, periods of attachments and separation, the child[ren]'s ability to integrate into a substitute placement or back into [their] parent's home and the child[ren]'s physical and emotional needs." 22 M.R.S. § 4055(2). Also relevant to the best interests determination is the harm the children may suffer if the parent's rights are not terminated, as well as the children's need for permanence and stability. *In re Jacob B.*, 2008 ME 168, ¶ 14, 959 A.2d 734; *see also Adoption of Lily T.*, 2010 ME 58, ¶ 37, 997 A.2d 722.

[¶50]  Isabelle and Abigail were seven and four years of age, respectively, at the time of the termination hearing. Both girls live in a stable, permanent family home with their mother and stepfather. The girls call their stepfather "Daddy" and he is a big part of their lives, acting as a father-figure for them in many ways. However, the lack of evidence regarding the

26

stepfather's prior termination of his parental rights to two of his three children did not allow the court to make an appropriate determination that the adoption of Isabelle and Abigail by this individual was in the children's best interests.

[¶51] Significantly, the record contains no evidence that the father ever harmed his children. The mother and the father both testified that, up until his arrest, the father was a good parent to his children and that there were no concerns about his parenting abilities. The reasons for the father's limited contact with his children since his arrest and incarcerations were insufficiently explored on this record. On this record, the evidence does not demonstrate, to the standard of clear and convincing evidence, that termination of the father's parental rights was in the children's best interests.

IV. CONCLUSION

[¶52] In these circumstances, neither the court's findings, nor the record upon which those findings are based, can support a determination, by clear and convincing evidence, that the father is an unfit parent or that the father cannot provide a nurturing parental relationship with his children once the relationship can be re-established. Further, the lack of sufficient evidence concerning the stepfather and the court's error in excluding the father's plans

regarding reunification with his children undermine the court's unfitness and best interests findings.

[¶53]   Accordingly, we conclude that the court's finding of parental unfitness and its determination of the children's best interests are not supported by clear and convincing evidence in the record.   Therefore, the judgment terminating the father's parental rights must be vacated.

The entry is:

> Judgment vacated.   Remanded for entry of judgment denying the petition for termination of the father's parental rights.

Wayne Doane, Esq. (orally), Exeter, for appellant father

Kerry Clark Jordan, Esq. (orally), Griffin & Jordan, LLC, Orono, for appellees mother and stepfather

Penobscot County Probate Court docket numbers A-2016-48-1 and A-2016-49-1
For Clerk Reference Only