MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2015 ME 163
Docket:         And-15-317
Submitted
 On Briefs:     December 17, 2015
Decided:        December 22, 2015

Panel:          SAUFLEY, C.J., and ALEXANDER, MEAD, and JABAR, JJ.

# IN RE J.V.

MEAD, J.

[¶1]  The father of J.V. appeals from a judgment entered by the District Court (Lewiston, *Dow, J.*) terminating his parental rights to the child pursuant to 22 M.R.S. § 4055(1)(B)(2) (2014).  Because we agree with the court's finding that the father "acted toward [the] child in a manner that is heinous or abhorrent to society," 22 M.R.S. § 4055(1-A)(A) (2014), and because he failed to rebut the resulting presumption of parental unfitness, *see id.*, we affirm the judgment.

## I.  BACKGROUND

[¶2]  The court made factual findings by clear and convincing evidence, which are supported by competent record evidence.  *See In re M.S.*, 2014 ME 54, ¶ 13, 90 A.3d 443.  The father's ex-girlfriend, whom the court found to be a credible witness, testified at the hearing on the Department of Health and Human Services's petition for termination of parental rights that on April 22, 2014, after she tried to go home following an argument with the father, he pulled her back into

2

his residence by the hair and refused to let her leave. In an incident lasting two to three hours, the father threw her up against a wall. The child, then age seven, was upstairs in his bedroom.

[¶3] The next morning, the father allowed the victim to return to her own nearby home. He then repeatedly sent the child to the victim's home with notes threatening to destroy the belongings that she had left behind. That afternoon, she returned to the father's residence to get her things. The victim testified that when she did,

> the next thing I knew . . . I was on the bathroom floor . . . and [the father] was . . . holding my head down on the floor and trying to duct tape me and had a knife to my throat and he had [the child] sharpening knives so he can cut me up into pieces later, and he had [the child] sit on my legs so I would[n't] move . . . .
>
> . . . .
>
> [The father was] telling [the child], "Sharpen those knives. We've got to chop up some meat later." . . . And he even showed him how to do it.
>
> Q: And did [the child] go and get knives?
>
> A: Yes, because [the child], I think, was either afraid of what [the father] would do to him or—[the child] was not enjoying it . . . .
>
> . . . .
>
> [The father] gives [the child] the [sharpening] stick and said, here, start sharpening them. That's when he said, "We're going to cut her up into pieces later." And while [the child] was sharpening the knives, [the father] had that big knife to my throat.

[¶4]  The court found that the victim's testimony "was corroborated by other evidence including the statements of [the child]."  J.V.'s foster mother testified that the child told her immediately after he arrived in her care, in a "[v]ery matter of fact" manner, that

> his dad had made him sharpen knives and had kidnapped [the victim] and was going to kill her.  And he said that he was sorry that he did that because he knew it was against the law.  But he was listening to his dad.

> [The child said] [t]hat his father was going to stab her to death.  He was going to cut her tongue out.  He was going to stab her eyes out.

> . . . .

> [The victim] had got out of his father's grasp at one point and his father was screaming at [the child], "Stab her.  Stab her."

[¶5]  J.V.'s guardian ad litem (GAL) testified that when she asked him about his life with his father, the child said, in a "[v]ery kind of blasé" way, that "[i]t was good until my dad tried to kill somebody."  The GAL said that the child's videotaped contemporaneous account of the assault given to police was "very, very detailed," and that it matched up closely with the victim's account.  The child "talk[ed] in the videos [] of being scared, of thinking that [the victim] was going to die."  The court found that the father greatly minimized his conduct in testifying about the assault at the hearing.

4

[¶6]  Following the father's arrest, the Department petitioned the District Court for a child protection order and for a preliminary protection order, pursuant to 22 M.R.S. §§ 4032, 4034 (2014).  A preliminary protection order was issued the same day and the child was placed in the custody of the Department, which in turn placed the child with his current foster family.  The father waived his right to a summary preliminary hearing.  *See* 22 M.R.S. § 4034(3).

[¶7]  Subsequently, the court (*Schneider, J.*) entered a jeopardy order by agreement.  The court found that the child and his older brother

> were the subjects of a 2008 child protection filing in the Farmington District Court [].  Findings in that case included a history of domestic violence between [the parents], chronic co-occurring substance abuse and mental health issues for both parents, and unstable housing for both parents.  While those issues appeared to be sufficiently resolved to result in the dismissal of that case, many of the same issues have continued and resulted in the current filing. The current child protection case was initiated when [the father] was arrested for domestic violence assault . . . . [The child] was in the care of his father and not only witnessed this event but was drawn into it by his father. [The child] confirmed this in interviews with police and with [the Department], and also reported ongoing substance abuse by his father.

[¶8]  On July 16, 2014, the Department filed a petition to terminate the father's parental rights pursuant to 22 M.R.S. § 4052 (2014).  The petition alleged in part that the father's involvement of J.V. in the April 2014 assault constituted "heinous and abhorrent conduct" creating a presumption of parental unfitness pursuant to 22 M.R.S. § 4055(1-A)(A).

[¶9]    In January 2015, the father pleaded guilty to criminal charges stemming from the assault, including domestic violence criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. §§ 209-A(1)(A), 1252(4) (2014); domestic violence assault (Class D), 17-A M.R.S. § 207-A(1)(A) (2014); endangering the welfare of a child (Class D), 17-A M.R.S. § 554(1)(C) (2014); and violating a condition of release (Class E), 15 M.R.S. § 1092 (2014).  The court (*Gorman, J.*) imposed an aggregate sentence of five years' imprisonment, with all but eighteen months suspended, and three years of probation.

[¶10]    The District Court held a hearing on the termination petition on April 28, 2015, hearing testimony from the victim of the assault, the foster mother, the Department's caseworker, the GAL, the child's first-grade teacher, two people who attended bible study with the father, and the father himself.  The court also considered the GAL's report, which, consistent with her testimony, recommended termination.  At the conclusion of the hearing, the court made findings from the bench and announced its decision that the father's parental rights would be terminated.  The court later issued a written order consistent with its oral findings.[1] The father appealed.

---

[1] The court's order terminated both parents' parental rights.  Only the father is a party to this appeal.

## II. DISCUSSION

[¶11] Before it could terminate the father's parental rights, the court was required to find, by clear and convincing evidence, that the father was an unfit parent and that termination was in the child's best interest. 22 M.R.S. § 4055(1)(B)(2). We have said that "[e]vidence is sufficient to affirm an order terminating parental rights when a review of the entire record demonstrates that the trial court rationally could have found clear and convincing evidence in that record to support the necessary factual findings as to the bases for termination." *In re L.D.*, 2015 ME 123, ¶ 14, 123 A.3d 990 (quotation marks omitted).

[¶12] By statute a parent is presumed, subject to rebuttal, to be unfit if he "act[s] toward a child in a manner that is heinous or abhorrent to society." 22 M.R.S. § 4055(1-A)(A). The trial court found that the father's conduct was "heinous and abhorrent," and we emphatically agree. The depravity of involving one's young son in a vicious and violent domestic assault by having him sharpen knives that he has been told will be used to murder the victim with his assistance in an unspeakable way is beyond comprehension. The emotional damage done to the child, demonstrated by his flat affect in describing the incident and by his need to apologize for his part in it, will no doubt take much time and effort to repair. Perhaps one day he will come to realize that he was an innocent, compelled by his father to do what he otherwise would never do. Perhaps he will not. In any event,

the court's finding is sufficient, standing alone, to establish by clear and convincing evidence that the father is unfit to parent J.V.

[¶13] We review the court's best interest finding "for an abuse of discretion, viewing the facts, and the weight to be given them, through the trial court's lens." *In re L.D.*, 2015 ME 123, ¶ 14, 123 A.3d 990 (quotation marks omitted). The court did not abuse its discretion here given its supported findings concerning J.V.'s need for permanency after a total of three years in foster care, the opportunity for adoption, the child's wishes, and the GAL's recommendation. *See In re A.H.*, 2013 ME 85, ¶ 16, 77 A.3d 1012; *In re Thomas H.*, 2005 ME 123, ¶ 33, 889 A.2d 297 ("In the lives of pre-adolescent children . . . more than two years[] is an eternity.").

The entry is:

> Judgment affirmed.

---

**On the briefs:**

> L. Clinton Boothby, Esq., Boothby Perry, LLC, Turner, for appellant father
>
> Janet T. Mills, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Lewiston District Court docket number PC-2014-28
FOR CLERK REFERENCE ONLY