MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2016 ME 137
Docket:       Cum-15-319
Argued:       April 6, 2016
Decided:      August 30, 2016

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, <u>GORMAN</u>, JABAR, and HUMPHREY, JJ.

## IN RE ALIJAH K.

GORMAN, J.

[¶1]  The father of Alijah K. appeals from a judgment of the District Court (Portland, *Powers, J.*) terminating his parental rights to the child pursuant to 22 M.R.S. § 4055 (2015).[1]  The father argues that the court impermissibly relied on the fact of his incarceration to find that he is unfit to parent Alijah.  We disagree, and affirm the judgment.

## I.  BACKGROUND

[¶2]  The Department of Health and Human Services instituted this child protection matter on December 18, 2013, roughly one month after the child's birth, and while the child was in only his mother's care.  In its child protection petition and accompanying request for a preliminary protection order, the Department alleged that the mother had reported to the Department that

---

[1]  The mother consented to the termination of her parental rights, and is not a party to this appeal.

"[the father] has left the state of Maine after being involved in legal trouble and she believes [he is] in Philadelphia. He has had no contact or involvement with Alijah." The court (*Kelly, J.*) entered a preliminary protection order placing Alijah in Department custody that day.

[¶3] The father was finally located and served at a prison in Pennsylvania in July of 2014.[2] In December of 2014, the court (*Powers, J.*) entered a jeopardy order with the father's agreement based on the following facts: "The father has never met Alijah and is currently incarcerated in Pennsylvania for the possession of a firearm by a convicted felon. His release date ranges from September 12, 2016 to March 12, 2019." *See* 22 M.R.S. § 4035 (2015). The father also agreed in the jeopardy order that, based on his lengthy incarceration, the Department could be relieved of its obligation to provide him with rehabilitation and reunification services. *See* 22 M.R.S. § 4041 (2015).

[¶4] On March 6, 2015, the Department filed a petition to terminate both parents' rights. The court conducted a hearing on the petition on June 9, 2015; the father participated via telephone from Pennsylvania, and his

---

[2] Meanwhile, the case underwent summary preliminary and jeopardy proceedings as to the mother alone, while the guardian ad litem reported that the child thrived in foster care. Once the father was located and served, genetic testing confirmed that the father is, in fact, the child's biological father. The court (*Powers, J.*) entered a paternity order to that effect in December of 2014.

attorney was present in the courtroom for the hearing. The father testified and his attorney cross-examined the Department's witnesses.

[¶5] By judgment dated June 16, 2015, the trial court made the following findings, which are supported by competent evidence in the record. The father is currently incarcerated in state prison in Pennsylvania serving a sentence for being a felon in possession of a firearm. His earliest possible release date is September of 2016, although he could be in prison until 2019. The father also pleaded guilty to charges of criminal trespass and disorderly conduct for entering someone's home in 2011 and for punching someone in 2012. He is the subject of a protection from abuse order obtained by a former girlfriend.

[¶6] The father has never met the child, who is now almost three years old. Although, as the court found, the father "claims not to have known he was the father until late 2014 through genetic testing," the father knew that the woman with whom he had had an intimate relationship was pregnant, and knew that she had given birth to a child. He also knew that the child had been taken into custody months before the genetic testing was complete, as is established by the court's finding that the father contacted the Department to inquire about the child as early as March of 2014. The father has spoken with

the Department on only two occasions. He has written to the child on only a handful of occasions, and only in response to letters from the foster parents. Further, although the father requested placement of the child with his own parents, none of his family members has agreed to take responsibility for the child.

[¶7] Based on these findings, the court terminated the father's parental rights on grounds that the father is unwilling or unable to protect the child from jeopardy within a time reasonably calculated to meet the child's needs, is unwilling or unable to take responsibility for the child within a time reasonably calculated to meet the child's needs, and failed to make a good faith effort to rehabilitate and reunify with the child; the court also found that termination is in the best interest of the child. *See* 22 M.R.S. § 4055(1)(B)(2). The father appeals. *See* 22 M.R.S. § 4006 (2015).

## II.  DISCUSSION

[¶8] The father asserts that the court impermissibly terminated his parental rights based only on the fact of his incarceration. In support of his argument, the father relies on *In re Cody T.*, 2009 ME 95, ¶ 28, 979 A.2d 81, for the proposition that a parent's incarceration, by itself, does not provide a

sufficient ground for the termination of parental rights. To guard against any over-reading of our existing case law, we discuss *In re Cody T.* in some detail.

[¶9] *In re Cody T.* involved a child who was born in Texas in 2004 and lived with both parents until the mother and father separated in 2005. *Id.* ¶ 3. The mother moved the child to Maine in 2006 without the father's knowledge. *Id.* ¶ 4. Maine's Department of Health and Human Services removed the child from the mother's custody in 2007. *Id.* ¶ 7. The father, who was never served in hand[3] with the petition for a child protection order, was incarcerated in Oklahoma at the time the child was removed from the mother's custody. *Id.* ¶¶ 5, 9.

[¶10] The termination hearing ended less than one month before the father's release date. *Id.* ¶ 13. The father's sister and her husband, who lived in Texas, appeared at the hearing and offered themselves as a placement for the child. *Id.* ¶¶ 13-14. The trial court found, based on competent testimony, that

> had Cody remained in Texas in a location known to the father's relatives, the relatives would have facilitated his visiting with the father while the father was incarcerated. However, because the mother had taken Cody from Texas and not advised the father or

---

[3] Although the mother represented that the father was incarcerated in Texas at the time, he was "served" by publication of a notice in a small Maine newspaper. *In re Cody T.*, 2009 ME 95, ¶¶ 7, 9, 979 A.2d 81.

his family of the location, the father and his family had no opportunity for contact with Cody for more than two years after the time that he was taken from Texas.

*Id.* ¶ 15. The trial court acknowledged that the father was, "through no fault of his own, a stranger to his son" based on the mother's actions in failing to inform the father of the child's location, but nevertheless terminated the father's parental rights based on his incarceration and also apparently placed the child with the paternal aunt in Texas. *Id.* ¶¶ 18, 30 (quotation marks omitted).

[¶11] We vacated the court's termination of the father's parental rights, concluding that

neither the court's findings, nor the record upon which those findings are based, can support a determination, by clear and convincing evidence, that the father is an unfit parent or that, with support through the court-ordered kinship placement, the father, now released from incarceration, cannot provide a nurturing parental relationship with his child once the relationship with the child can be re-established. Further, considering the recent significant change in the child's home life, there is no evidence that fostering a re-established relationship with his father would promote greater harm to Cody. Accordingly, we must conclude that the court's finding of parental unfitness with respect to the father, in this case, is not sufficiently supported by clear and convincing evidence in the record.

*Id.* ¶ 31.

[¶12]  Our decision in *In re Cody T.* was based on many factors, including that the mother's actions prevented the father from having contact or a relationship with his child, and indeed, denied the father any knowledge of his child's whereabouts for almost two years; the lack of notice given to the father during the first year of child protection proceedings; the availability of family members who were ready, willing, and able to care for the child while the father was incarcerated, and who would have facilitated the father's contact with and connection to the child; that the father was due to be released from prison only twenty-two days after the termination hearing was concluded; that as soon as the father became aware of the pending child protection case in Maine, he took steps to vacate the jeopardy order that had been issued without notice to him; and the court's placement of the child with the father's family. *Id.* ¶¶ 3-31.

[¶13]  We review *In re Cody T.* with an eye toward its unique facts and many nuances, and decline to adopt the blunt view that it stands for the proposition that a parent's incarceration is irrelevant to a determination of parental unfitness.  By stating that incarceration *alone* cannot provide a basis for termination, *see In re A.M.*, 2012 ME 118, ¶ 30, 55 A.3d 463; *Adoption of Lily T.*, 2010 ME 58, ¶ 21, 997 A.2d 722; *Adoption of Hali D.*, 2009 ME 70, ¶ 2,

974 A.2d 916; *In re Daniel C.*, 480 A.2d 766, 768-69 (Me. 1984), we have apparently led the father—and perhaps others—to believe that parents who are incarcerated are held to a lesser standard than parents who are not incarcerated.

[¶14] Contrary to the father's suggestion, neither *In re Cody T.* nor any other authority gives a parent a "pass" on parental responsibilities as a result of being incarcerated. A parent who is unable to fulfill his parental responsibilities by virtue of being incarcerated is entitled to no more protection from the termination of his parental rights than a parent who is unable to fulfill his parental responsibilities as a result of other reasons. Whether because of mental illness, substance abuse, violence, incarceration, or some other reason, a parent who is unable to meet his child's needs—now and for the foreseeable future—is an unfit parent whose parental rights are subject to termination.

[¶15] We review a trial court's findings for clear error, and will vacate a court's finding according to the clear error standard of review only if that finding is not supported by competent record evidence; "is based on a clear misapprehension by the trial court of the meaning of the evidence"; or "is so against the great preponderance of the believable evidence" that, based on

"the force and effect of the evidence, taken as a total entity," the finding "does not represent the truth and right of the case." *In re A.M.*, 2012 ME 118, ¶ 29, 55 A.3d 463 (quotation marks omitted). Here, unlike in *In re Cody T.*, the court found, by clear and convincing evidence, that the father knew of but never made any effort to meet his child before he was incarcerated. That finding is supported by the father's testimony that he was in touch with the child's mother throughout her pregnancy, and spoke with the mother on the day she gave birth to the child. When asked what he and the mother had discussed, the father testified:

> My discussions with [the mother] was, you know, how she was doing, where she was at, if she needed any financial support, how my son was doing. . . . I wanted to know how she was doing as far as her wellbeing because we were not together and I was so far away in Pennsylvania and she conveyed to me that, you know, she felt alone. She felt like I had abandoned her and things along those lines.

At the termination hearing, the Department established—and the father acknowledged—that Alijah had been in the State's custody for all but one month of his life, the father could not care for—or even act as a resource for—the child, and the father would be unable to do so for at least one more year after the termination hearing. The father also could offer no friend or family

member who could care for or protect the child while the father remained incarcerated.

[¶16]  We agree that a parent's incarceration is but one factor to be considered by a court faced with a termination petition, but it is *a factor*—a factor that may, in some cases, lead a court to terminate that parent's rights. Each case involving an incarcerated parent is different.  In each case, the court is required to consider the underlying parent-child relationship and the effect incarceration has had, is having, and will continue to have on that relationship.  As one commentator suggested nearly twenty years ago,

> In light of the psychological data and due process concerns, the most beneficial approach is one that analyzes the parent-child relationship as a whole.  Specifically, all states should provide a full adversarial hearing at which the parent is present and represented by counsel.  At the hearing, the court should consider several factors in assessing whether to terminate parental rights. Specifically, the court should examine the parent-child relationship before and after incarceration as well as the psychological impact of the parent's incarceration on the child. The court should also consider the parent's ability to fulfill his or her responsibilities as a parent during incarceration.  While it is true that the fact of incarceration is an important factor to consider in termination proceedings, it should not be dispositive. States that terminate parental rights based on incarceration status may permanently sever the important, positive relationship that a parent and child share.  This decision would seem shortsighted in cases in which the parent will be incarcerated for a relatively short period of time or wherein the crime committed is not indicative of the prisoner's parenting skills.  Conversely, failure to undertake a full analysis of the parent-child relationship may

> leave a child in a damaging, harmful relationship with a parent merely because the parent maintained minimal contacts or because the parent did not commit the "right" kind of crime to allow for termination.

Steven Fleischer, Note, *Termination of Parental Rights: An Additional Sentence for Incarcerated Parents*, 29 Seton Hall L. Rev. 312, 314-15 (1998).

[¶17]  We agree that courts should, whenever possible, preserve and strengthen families, even when—or perhaps especially when—those families are most in need of assistance.  Here, however, there simply was no "family" to preserve.   At the court's direction, and with the father's full support, all of the Department's reunification efforts were directed toward the mother.  When those efforts failed, the child was left with no family.

[¶18]  When, as here, the child was in the State's custody for all but one month of his life; when the anticipated length of the parent's incarceration would extend an additional year beyond the termination proceeding; when the location of the prison where the parent is housed precludes or severely restricts any opportunity for visits; when the parent has agreed to forego any State-directed attempts at creating a bond with his child; when all family members or friends identified as possible caretakers or guardians for the child have refused to take on the responsibility; and when there is not only no longstanding parent-child relationship but, in fact, the child has never even

met his incarcerated parent, the evidence supports the court's findings that the father cannot protect his child from jeopardy or take responsibility for the child in a time reasonably calculated to meet the child's needs, and therefore is unfit[4] to parent the child.[5]

The entry is:

> Judgment affirmed.

---

**On the briefs:**

Lauren Wille, Esq., DeGrinney Law Offices, Portland, for appellant father

Janet T. Mills, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

E. James Burke, Esq., and Isabel Mullin, Stud. Atty., Cumberland Legal Aid Clinic's Prisoner Assistance Clinic,

---

[4] The father also challenges the court's finding of unfitness on the ground that he failed to make a good faith effort to rehabilitate and reunify with the child, as well as its finding that termination is in the child's best interest. *See* 22 M.R.S. § 4055(1)(B)(2)(a), (b)(iv) (2015). We discern no clear error in the court's finding of this ground of parental unfitness, nor any clear error or abuse of discretion in the court's determination that termination is in the child's best interest, and we do not discuss them further. *See In re J.V.*, 2015 ME 163, ¶ 13, 129 A.3d 958.

[5] We note, also, that the constitutional preference for biological parents may be tested in coming years, as Maine and other states adopt some version of the Uniform Parentage Act. This law recognizes—and emphasizes—that the relationships created between children and the nonrelated adults who care and provide for them may, in some cases, be stronger and more positive for the children than the relationships created by genetic bonds. *See* 19-A M.R.S. §§ 1831-1938 (2015). The emphasis on biological family articulated in *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982), may be abating given that families are no longer limited to one mother, one father, and the children they beget.

Portland, for amicus curiae Cumberland Legal Aid Clinic's Prisoner Assistance Clinic

Zachary Heiden, Esq., American Civil Liberties Union of Maine Foundation, Portland, Jamesa J. Drake, Esq., Drake Law LLC, Auburn, and Danylle Carson, Esq., Boothby Perry, LLC, Turner, for amicus curiae American Civil Liberties Union of Maine Foundation

**At oral argument:**

Lauren Wille, Esq., for appellant father

Meghan Szylvian, Asst. Atty. Gen., for appellee Department of Health and Human Services

Portland District Court docket number PC-2013-118
FOR CLERK REFERENCE ONLY