MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2020 ME 118
Docket:      And-19-491
Argued:      September 16, 2020
Decided:     October 6, 2020

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and, CONNORS, JJ.


ADOPTION BY JESSICA M. et al.


PER CURIAM

[¶1]  The parents of a child appeal from a judgment of the Androscoggin County Probate Court (*Dubois, J.*) terminating their parental rights in anticipation of adoption pursuant to 18-A M.R.S. § 9-204 (2017), on the petition of the child's maternal aunt and uncle.[1]  Both parents challenge the sufficiency of the evidence supporting the court's findings that they are unfit to parent the child and that termination of their parental rights is in the child's best interest. The father also contends that (1) his right to due process was violated because his appearance at the termination hearing was telephonic and (2) the court

---

[1]  The Probate Code was repealed and recodified while this matter was pending in the Probate Court.  *See* P.L. 2017, ch. 402, §§ A-1, A-2, F-1 (effective July 1, 2019); *see also* P.L. 2019, ch. 417, § B-14 (emergency, effective June 20, 2019) (establishing September 1, 2019, as the effective date of the recodified Probate Code).  Unless otherwise specified, all citations in this opinion to the Probate Code and related provisions of the Child and Family Services and Child Protection Act are to the statutes that were in effect when the aunt and uncle initiated this case in 2018.  *See In re Boardman*, 2017 ME 131, ¶ 4, 166 A.3d 106.

2

abused its discretion by considering a portion of the transcript of his federal criminal sentencing hearing. We affirm the judgment.

## I. BACKGROUND

[¶2] On March 26, 2018, the aunt and uncle, who are the child's legal guardians, filed petitions for termination of the parents' parental rights and for adoption of the child. *See* 18-A M.R.S. §§ 9-204, 9-301 (2017). They filed an amended petition for termination of parental rights in June 2018. The parents, both of whom were incarcerated at the time, objected, and the court appointed an attorney to represent each of them. In August 2018, after holding a pretrial conference, the court noted on the docket record that the father's attorney was to investigate whether the final hearing could be held in a District Court courtroom because "there [would] be issues with having both parents appear by video for the trial." In a request for approval of expanded work hours filed in December 2018, the father's attorney indicated that she "still need[ed] to . . . schedule video attendance with" the federal correctional institution where the father was incarcerated.

[¶3] The court held the first two days of a three-day final hearing on April 10 and 11, 2019. The father appeared by telephone. At the beginning of the first day of the hearing, the father requested that the court continue the

hearing to allow more time for him to arrange a video appearance in order to enhance the court's ability to assess his demeanor. The father indicated that the New Jersey prison where he was incarcerated had been unable to set up the technology necessary for a video appearance and that more time might facilitate that process. After he agreed that telephonic participation would suffice, at least during the testimony of some of the aunt and uncle's witnesses, the court denied his request for a continuance. The court permitted recesses as necessary for the father to confer privately with his attorney by telephone and ruled that it would keep the evidentiary record open in case video technology could be arranged at some point during the proceedings.[2]

[¶4]   On July 16, 2019, the court sent the parties a notice setting August 13, 2019, as the date for the third day of the hearing.[3] The notice stated,

---

[2] At one point during the extensive discussion of this issue on the record, the father's attorney indicated that the District Court (Lewiston) was capable of establishing a video connection with the federal prison but that "the request would have to come from [the Probate Court] directly to" the District Court. The father's attorney also agreed with the court that it was "not possible" to transport the father for in-person attendance.

The parties did not discuss the issue on the record during the second day of the hearing, but the court later noted on the docket record that the father's attorney was "to inquire with [the] District Court [whether] their system [wa]s compatible with the federal prison system, to allow [the father] to be seen and heard when taking the witness stand." "[I]f so," the court stated, it would "hold the remaining part of [the] trial" in a District Court courtroom.

[3] In June 2019, the aunt and uncle had filed a "motion to set trial dates," stating that the Administrative Office of the Courts had approved the father's request for the third day of the hearing to be held in a District Court courtroom, that the District Court still had not provided any information about dates that a courtroom would be available for the hearing, that the father's attorney indicated that she planned to have a test of the video conference system completed but had not yet done so,

4

"If any party needs to participate telephonically or by video, you must get the necessary contact information to the Court by July 30, 2019, so that we may make the necessary arrangements." Nothing in the record indicates that the father provided this information to the court, and the third day of the hearing proceeded in the Probate Court. The father again requested a continuance, indicating that the federal prison had encountered technological problems that prevented an appearance by video. The court denied that motion and noted on the docket record that the "federal prison was unable to make video conferencing available for" the father.

[¶5] During the third day of the hearing, the aunt and uncle sought to admit in evidence the transcript of a January 2017 hearing at which the father had been sentenced in federal court after pleading guilty to a crime. The father objected. The parties and the court discussed whether portions of the transcript were subject to judicial notice or were otherwise admissible in evidence. The court first stated that the transcript was admitted "as it relates to the [federal] Court's findings placed on the record . . . [f]or whatever weight that has." Then, after hearing the father's renewed objection, the court ruled that only the portion of the transcript constituting "an order of the [federal]

---

and that the petitions had been pending for more than a year. The record does not contain any response to this motion from the father. The court granted the motion.

court" would be admitted and that the transcript was admitted "conditional[ly]" because "there [was] an issue with respect to which portion . . . [could] be construed as an order of the [federal] Court."

[¶6]  After the hearing, the court entered a judgment terminating both parents' parental rights to the child.[4]  The court made the following findings, which, except as noted, are supported by competent evidence in the record.

> At the time of [the child's] birth, both . . . parents were incarcerated and the child came into the custody of the Department of Health and Human Services.  [The child] was placed in the care of the maternal grandmother, . . . and remained in the custody of the Department for approximately two years.

> In 2009, after [the father] successfully complet[ed] a court ordered reunification plan, the child protection action was dismissed and [the child] was placed in the care of [the father].  A [p]arental [r]ights and [r]esponsibilit[ies] [o]rder was entered granting [the father] sole parental rights and responsibilities.  Contact between [the child] and [the mother] was . . . on a supervised basis until [the mother] could demonstrate "mental

---

[4] During the hearing, the mother indicated that she had decided to consent to the aunt and uncle's adoption of the child and that she did not want to "challenge any of the [aunt and uncle's] witnesses" at the hearing.  She could not sign a consent form before the court, however, *see* 18-A M.R.S. § 9-204(b) (2017); 22 M.R.S. § 4055(1)(B)(1) (2017), because she had been unable to print the form and was appearing by video.  Her attorney also indicated that the mother wished to consent to the adoption "should the Court grant the adoption over [the father's] objections" but that she did *not* wish to concede "that the Court ha[d] grounds to terminate her parental rights."  Her attorney said, "[I]f the Court agrees that the adoption will go through, then she consents to that adoption, . . . she will not contest her side of it."  The court asked the attorney to remain present in case the mother's decision changed and because "she hasn't officially consented until she signs a form."  At the end of the hearing, the mother indicated, through her attorney, that she intended "to consent to the adoption as to herself" but not "as to" the father.  The parties and the court agreed to leave the record open for three weeks so that she could submit a written consent form.  She did not do so.  In her written closing argument, the mother argued that the court should not find that *the father* was unfit and that termination of the parents' rights was not in the child's best interest.  She did not present any argument concerning her own fitness as a parent.

health stability, no criminal involvements and sobriety.["] [The mother] left the state of Maine and no evidence was presented that she ever returned for a visit or otherwise. [The mother] has a significant criminal history as well as substance abuse and mental health issues to include suicide attempts. The maternal grandmother . . . did not recall a time when [the mother] had gone a year without being incarcerated and has not known of a period when [the mother] ever had stable housing or regular employment. At the time of the hearing, [the mother] was in an Alabama prison. . . . [T]here was no evidence presented to indicate [that the mother] has had any meaningful contact whatsoever with [the child] following his birth. . . . [The mother] has never had a relationship with [the child] . . . .

[After the father] was granted custody of [the child] . . . and until [the father's] most recent period of incarceration, [the child] resided with [the father] at various residences in Bangor and Rumford . . . . [T]he child was reported absent [twenty-eight] times in kindergarten, [seventeen] times in first grade[,] and [thirty-five] times in second grade . . . [and he] was often tardy. The frequent absences and tardiness adversely affected [the child's] academic and social development. . . . [The child] came to school disheveled and tired, often falling asleep in class.

[The child's] teachers addressed with [the father] concerns regarding [the child's] attendance and school performance without success. . . . It was recommended that [the father] look into [o]ccupational [t]herapy screenings to address [the child's issues].

. . . [N]o well child checks occurred after age [four] and [the child] received minimal medical treatment despite evidence of treatable health conditions. When [the child] came to live with [the p]etitioners, he had [several untreated medical issues], all of which were resolved with medical treatment.

. . . .

At trial, [the father] testified that he had no concerns for [the child's] development or medical needs at the time when [the child] was left in the care of the maternal grandmother.

. . . On January 23, 2017, [the father] was adjudicated guilty of conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base. [The father] was sentenced to a period of [sixty] months in prison followed by [three] years of supervised release. [The father] will not be released [from prison] until November 2020 at the earliest. [The father] testified that he will not be in a position to provide for [the child's] needs until the completion of his supervised release . . . . [The child] will be thirteen years old if [the father] is released in November 2020 and sixteen years old when [the father] completes his supervised release requirement.

At [the father's] request, the maternal grandmother provided [the child's] care beginning [in] June 2016. For the next year [the father] sent [the child] a few letters and called a few times.

In May 2017, [the child] moved in with the [aunt and uncle,] who . . . were granted guardianship of [the child] in January 2018. Initially, [the aunt and uncle] paid for [a] text [messaging] service to allow communication between [the father] and [the child]. [The father's] texts were sporadic and often weeks would go by between texts. Although [the child] was free to initiate contact with [the father], he did not do so. In June 2018,[5] the [aunt and uncle] terminated the text service [based on the father's] sporadic use, [the child's] non-use and [the child's] reaction to the text messages.

Since May 2017, [the aunt and uncle] received four letters from [the father], all of which were received after the . . . petitions [for adoption and termination of parental rights] were filed and discovery was served.

---

[5] The evidence admitted on this topic suggested that the aunt and uncle stopped paying for the text messaging service in March or April 2018.

8

. . . While in the [aunt and uncle's] care, [the child] has progressed academically. [He] comes to school prepared with his homework completed and is now performing at grade level. He is engaged in sports, which has helped him grow physically, emotionally and socially. [He] is in counseling and working with an occupational therapist. He is wearing . . . orthotics.

The [aunt and uncle] have provided [the child] with a structured and safe home environment and are meeting all of his developmental, physical, education[al], extracurricular, social, financial and emotional needs. [The child] has developed a close bond with [the aunt and uncle] as well as his half-sister . . . .

(Footnotes omitted.)

[¶7] The court ultimately found that both parents abandoned the child,[6] that the father would not "be in a position to meet the needs of [the child] within a time reasonably calculated to meet [the child's] needs," and that termination of the parents' parental rights is in the child's best interest. *See* 18-A M.R.S. § 9-204(b); 22 M.R.S. § 4055(1)(A)(2), (B)(2)(a), (b)(ii), (iii) (2017). Neither parent filed a motion for further findings, *see* M.R. Prob. P. 52; M.R. Civ. P. 52(b), or any other post-trial motion. *See Adoption by Stefan S.*, 2020 ME 5, ¶¶ 2-3, 223 A.3d 468; *Guardianship of Ard*, 2017 ME 12, ¶ 15, 154 A.3d 609 ("In the absence of a motion for findings of fact, *see* M.R. Civ. P. 52(a), we assume that the court found all of the facts needed to support its decision if those facts are

---

[6] We are not persuaded by the father's argument that the court did not make clear whether it found that the father had abandoned the child. *See Adoption of Lily T.*, 2010 ME 58, ¶ 22, 997 A.2d 722; *see also* 18-A M.R.S. § 9-204(b); 22 M.R.S. § 4002(1-A) (2017).

supported by competent evidence." (footnote omitted) (quotation marks omitted)).  The parents timely appealed.[7]  *See* 18-A M.R.S. § 1-308 (2017); M.R. App. P. 2B(c)(1).

## II.  DISCUSSION

A.    Due Process

[¶8]  The father argues that he was deprived of his right to due process because the court denied his request to continue the hearing so that he could

---

[7] We invited briefs of amici curiae on the following questions:

When a parent is unable, at least temporarily, personally to provide direct care of a child, and when the child is being cared for safely and appropriately by relatives under a guardianship (or a power of attorney or similar arrangement),

1. What factors, circumstances and public policies may, or must, a court consider when determining whether that parent is "unfit" for purposes of terminating the parent's parental rights upon a petition by the guardians to adopt the child?

2. What factors, circumstances and public policies may, or must, a court consider when determining whether termination is in the child's best interest?

3. What effect does the parent's incarceration—as opposed to another reason for the parent's inability to care for the child, such as employment, military service, or deportation—have on the analysis of parental unfitness and the child's best interest?

4. Should a court's consideration of a petition for termination of parental rights take into account that the action has been initiated by a party other than the State?

5. What is the relevance, if any, of the extent of the absent parent's role in actively arranging for a guardianship (or other childcare placement)?

Briefs of amici curiae were submitted by Disability Rights Maine and Kristina R. Dougherty, Esq.

make further attempts to arrange his participation by video instead of by telephone, and the court therefore could not "visibly assess [the father's] demeanor and credibility." In general, we review the denial of a motion to continue for an abuse of discretion. *In re A.M.*, 2012 ME 118, ¶ 14, 55 A.3d 463. "When due process is implicated, we review such procedural rulings to determine whether the process struck a balance between competing concerns that was fundamentally fair." *Id.* (quotation marks omitted).

[¶9] "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation marks omitted). Due process is a "flexible concept" that we analyze in the context of the "particular situation" at hand. *In re A.M.*, 2012 ME 118, ¶ 15, 55 A.3d 463 (quotation marks omitted). Three factors must be considered in determining whether a due process violation occurred:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335; *accord In re A.M.*, 2012 ME 118, ¶ 15, 55 A.3d 463;

*In re Randy Scott B.*, 511 A.2d 450, 452-53 (Me. 1986). In the context of a

hearing held to determine whether parental rights must be terminated, "due

process requires: notice of the issues, an opportunity to be heard, the right to

introduce evidence and present witnesses, the right to respond to claims and

evidence, and an impartial factfinder." *In re A.M.*, 2012 ME 118, ¶ 16,

55 A.3d 463 (quotation marks omitted).

[¶10] The father does not contend that he was deprived of notice of the

issues or an impartial fact-finder, or that he was prevented from responding to

evidence. We therefore focus on the question of whether his telephonic

participation deprived him of a meaningful opportunity to be heard.

[¶11] In *In re A.M.*, we considered a termination hearing at which the

parent did not appear at all. *Id.* ¶¶ 5-10, 13-27. The parent had been arrested

the night before the hearing and could not be transported to court because she

had been under the influence of cocaine and bath salts and "remained

incoherent." *Id.* ¶¶ 6-7. The court denied the mother's motion to continue the

hearing and eventually ordered the termination of her parental rights. *Id.*

¶¶ 7, 10. In examining her due process argument on appeal, we explained that

> [w]hen a parent is known to be incarcerated in advance of a
> hearing, the court must, upon request by the parent, *provide a*

12

> *meaningful opportunity for the parent to participate in the hearing whether in person, by telephone or video, through deposition, or by other means* that will reasonably ensure an opportunity for the parent to be meaningfully involved in the hearing.

*Id.* ¶ 20 (emphasis added). We described "alternative means" by which a parent not physically present[8] could participate, including "[t]hrough a request for contemporaneous or periodic consultation with counsel during the hearing." *Id.* ¶ 22.

[¶12] The process that the court fashioned in this case was sufficient to offer a meaningful opportunity to be heard and to protect the father's right to a fair hearing. Even accepting the notion that the physical presence of a witness may enhance a fact-finder's ability to make credibility determinations,[9] as we mentioned in *In re A.M.*, *id.* ¶ 20 n.2, we decline to hold that the court was required to grant the father's motion to continue in the particular circumstances of this case. The father was provided with notice of all of the

---

[8] We noted that "[d]ue process does not require that a parent be physically present at the termination hearing, as long as notice of the hearing was given in a manner calculated to give actual notice and the parent had an *opportunity* to be heard." *In re A.M.*, 2012 ME 118, ¶ 18, 55 A.3d 463 (quotation marks omitted).

[9] We note, however, the Massachusetts Supreme Judicial Court's recent holding that a trial court did not err by empaneling a person who was blind as a juror in a criminal case where "the identification of the perpetrator was not in question." *Commonwealth v. Heywood*, 484 Mass. 43, 46 (Mass. 2020); *see Morales v. Artuz*, 281 F.3d 55, 61 & n.3 (2d Cir. 2002) (describing the idea "that demeanor is a useful basis for assessing credibility" as "grounded perhaps more on tradition than on empirical data" and discussing social science research on the topic).

hearing dates.  The court facilitated his participation by telephone, and he was represented by an attorney who was physically present in the courtroom and who cross-examined the aunt and uncle's witnesses.  *See In re Alijah K.*, 2016 ME 137, ¶ 4, 147 A.3d 1159.  The court made clear that it would take recesses to permit the father to consult with his attorney privately whenever he wished to do so.  By the time the first day of the hearing began, the matter had been pending for more than a year, but the father waited until the parties and witnesses were assembled to move to continue the hearing.  The court agreed to keep the record open in case a video connection could be established.  Although four months elapsed between the second and third days of the hearing, during which the record remained open, the father did not secure arrangements for the trial to be held in a District Court courtroom and again did not move to continue the hearing until after it had begun.  The father provided no proffer that a continuance would, in fact, result in the court's ability to view a live video of the father.  Under these circumstances, the court's process struck a fair balance among the competing concerns of the need to consider the father's testimony, the need to provide a timely determination for all of the parties involved, and the father's significant interest in a fair

14

proceeding.  *See In re A.M.*, 2012 ME 118, ¶¶ 26-27, 55 A.3d 463; *In re Randy Scott B.*, 511 A.2d at 453-54.

B.     Evidentiary Ruling

[¶13]  The father argues that the court erred by taking judicial notice of, or otherwise considering as evidence, some portion of the transcript of the father's sentencing hearing in federal court.[10]  We review evidentiary rulings for clear error or an abuse of discretion.  *State v. Churchill*, 2012 ME 121, ¶ 6, 32 A.3d 1026.  "A court abuses its discretion in ruling on evidentiary issues if the ruling arises from a failure to apply principles of law applicable to a situation resulting in prejudice."  *State v. Hussein*, 2019 ME 74, ¶ 10, 208 A.3d 752 (quotation marks omitted).

[¶14]  We note that the court would have erred if it had taken judicial notice of *findings* issued by the federal court as reflected in the sentencing transcript.  A court "may judicially notice a fact that is not subject to reasonable dispute because it . . . [i]s generally known within the trial court's territorial jurisdiction; or . . . [c]an be accurately and readily determined from sources

---

[10]  We do not address the father's argument relating to the authenticity of the transcript, which he has raised for the first time on appeal.  *See, e.g., Cyr v. Cyr*, 432 A.2d 793, 797 (Me. 1981) ("No principle is better settled than that a party who raises an issue for the first time on appeal will be deemed to have waived the issue . . . .").

whose accuracy cannot reasonably be questioned." M.R. Evid. 201(b). As we have explained,

> When a court takes judicial notice of a final judgment, from a Maine court or another court of competent jurisdiction, . . . that "notice" is limited to the existence of the judgment, and the action of the court. A court may take notice of another court's order only for the limited purpose of recognizing the judicial act that the order represents or the subject matter of the litigation.

*In re Jonas*, 2017 ME 115, ¶ 38 n.10, 164 A.3d 120 (alteration omitted) (quotation marks omitted). "[T]he *factual findings* contained within a judgment are not appropriate subjects for judicial notice," *id.*, unless "those findings meet the requirements of collateral estoppel," *Cabral v. L'Heureux*, 2017 ME 50, ¶ 11, 157 A.3d 795.[11] Contrary to the aunt and uncle's assertion, the requirements of collateral estoppel were not met here, where the federal sentencing court operated under a less stringent burden of proof than did the Probate Court. *See Grogan v. Garner*, 498 U.S. 279, 284-85 (1991) (explaining that a fact found pursuant to the standard of proof by a preponderance of the evidence cannot be given collateral estoppel effect in a subsequent proceeding in which the proponent must meet the standard of proof by clear and convincing evidence),

---

[11] The "unique evidentiary treatment" permitting a judge to take judicial notice of evidence and findings from prior proceedings *before the same judge* in a unified child protection proceeding plainly does not apply here. *Cabral v. L'Heureux*, 2017 ME 50, ¶ 10 n.3, 157 A.3d 795; *see In re Scott S.*, 2001 ME 114, ¶¶ 12-16, 775 A.2d 1144.

*superseded in part by statute*, Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 801, *as recognized in Osborne v. Kakas*, No. 17-CV-00254, 2018 U.S. Dist. LEXIS 42729, at *3-4 (E.D. Tex. Feb. 15, 2018); Restatement (Second) of Judgments § 28(4) (Am. Law Inst. 1982); *see also* 18-A M.R.S. § 9-204(b); 22 M.R.S. § 4055(1)(B)(2) (2017) (establishing that the court must make unfitness and best interest findings by clear and convincing evidence in order to terminate parental rights); *United States v. Cox*, 851 F.3d 113, 120 (1st Cir. 2017) ("[T]he preponderance-of-the-evidence baseline for considering sentencing facts has long been established in this circuit.").

[¶15]  Here, however, the record indicates that to the extent that the court ultimately considered any portion of the transcript as evidence, it considered only the sentence imposed.  Upon the father's first objection, the court initially stated that it would "admit" the transcript "as it relate[d] to the [federal] Court's findings placed on the record . . . [f]or whatever weight that has to the proceedings."  After the father renewed his objection, however, the court ruled that "if it's not an order of the [federal] Court, then it's not coming in.  But the order of the Court comes in . . . ."  At the end of the hearing, when reviewing with the parties the evidence that would be considered, the court noted that its admission of the transcript was "conditional" because "there

[was] an issue with respect to which portion . . . [could] be construed as an order of the [federal] Court."

[¶16]  The only portion of the transcript that could constitute the sentencing court's order was the portion in which the court imposed the father's sentence, and the trial court here could properly take judicial notice of the father's sentence "for the limited purpose of recognizing the judicial act that the order represent[ed] or the subject matter of the litigation," *In re Jonas*, 2017 ME 115, ¶ 38 n.10, 164 A.3d 120 (quotation marks omitted).[12]  That portion of the transcript was also entirely cumulative of the criminal judgment itself, which was properly admitted in evidence during the termination hearing. Nothing about the court's findings indicates that it considered any portion of the sentencing transcript for any purpose other than the fact of conviction and the sentence, and the father did not ask the court to clarify or reconsider its ruling, or move for further findings.  *See Springer v. Springer*, 2009 ME 118, ¶ 2, 984 A.2d 828 ("The appellant bears the burden of providing an adequate record upon which the reviewing court can consider the arguments on appeal."); *see also State v. Robbins*, 2012 ME 19, ¶¶ 2-4, 37 A.3d 294 (discussing the

---

[12]  We therefore do not address the question of whether the erroneous consideration of other parts of the transcript, such as the court's findings, would have constituted harmless error.  We note, as we did at oral argument, that the aunt and uncle's rationale for attempting to have the court consider this transcript at all is not clear.

"presumption of regularity" that applies to court proceedings, absent evidence of irregularity (quotation marks omitted)). The court therefore did not err or abuse its discretion by considering only the portion of the transcript reflecting the federal court's imposition of the father's sentence.

## C. Sufficiency of the Evidence

[¶17] Both parents challenge the sufficiency of the evidence supporting the court's termination of their parental rights. We review the court's findings of unfitness for clear error and its determination that termination of parental rights is in the child's best interest for clear error or an abuse of discretion. *Adoption by Stefan S.*, 2020 ME 5, ¶ 10, 223 A.3d 468. We also review "[t]he court's ultimate decision to terminate parental rights . . . for an abuse of discretion." *Id.* (quotation marks omitted). A finding is clearly erroneous "only if there is no competent evidence in the record to support it; if the fact-finder clearly misapprehended the meaning of the evidence; or if the finding is so contrary to the credible evidence that it does not represent the truth of the case." *Id.* (quotation marks omitted). "When the burden of proof at trial is clear and convincing evidence, our review is to determine whether the fact-finder could reasonably have been persuaded that the required findings were proved to be highly probable." *Id.* (quotation marks omitted).

1. The Mother's Parental Rights

[¶18] We decline to disturb the court's determinations as to the mother. The court's findings that the mother abandoned the child and that termination of her parental rights is in the child's best interest are supported by the evidence of the mother's significant substance abuse and mental health issues, her history of criminal activity and incarceration, and her near complete lack of contact with the child since his birth in 2007, as well as the evidence that the child has thrived while in the care of the aunt and uncle, who stand ready to adopt him.[13] *See* 18-A M.R.S. § 9-204(b); 22 M.R.S. § 4055(1)(B)(2).

2. The Father's Parental Rights

[¶19] Also supported by competent evidence in the record is the court's finding that the father is unfit to parent the child—in other words, that the father is unable to take responsibility for the child within a time reasonably calculated to meet the child's needs.[14] *See* 18-A M.R.S. § 9-204(b); 22 M.R.S.

---

[13] To the extent that the mother argues that termination of her parental rights was an abuse of discretion because of the *father's* prior relationship with the child, that argument is misguided. The questions before the court pertaining to the mother's parental rights were whether *she* was unfit to parent the child and whether termination of *her* parental rights would serve the child's best interest.

[14] Because we cannot conclude that the court committed clear error by finding that the father is unfit on this basis, we need not address the court's additional finding that the father abandoned the child. *See, e.g.*, *In re Children of Corey W.*, 2019 ME 4, ¶ 19, 199 A.3d 683 ("Where the court finds multiple bases for unfitness, we will affirm if any one of the alternative bases is supported by clear and convincing evidence." (quotation marks omitted)).

§ 4055(1)(B)(2)(b)(ii). The father testified that he will not be able to meet the child's needs until after completing his sixty-month prison term and three years of supervised release, when the child will be fifteen or sixteen years old. Other evidence admitted at the termination hearing included that the father has a long history of criminal conduct and incarceration, having been arrested over forty times—twice in the child's presence; that he is in his fifties and has struggled with drug addiction since he was in his twenties; that while in the father's direct care the child was left in unsafe situations on multiple occasions, was frequently absent from school, did not receive sufficient medical care, and experienced delayed social and emotional development; and that the father, while living with the child, used and sold cocaine in and from their residence.

[¶20] We reiterate that the father's incarceration alone would not constitute sufficient evidence to support a finding of unfitness, *see In re Alijah K.*, 2016 ME 137, ¶ 16, 147 A.3d 1159, but also that a parent who, for whatever reason, "is unable to meet his child's needs—now and for the foreseeable future—is an unfit parent whose parental rights are subject to termination," *id.* ¶ 14. Here, the court's finding that the father is unable to take responsibility for the child within a time reasonably calculated to meet the child's needs is supported by the challenges presented by the length of the

father's incarceration or restriction and his resulting absence from his child's day-to-day life, viewed in conjunction with (1) the evidence of the father's limited contact with the child while he has been incarcerated and (2) the evidence of the father's difficulty nurturing the child when he was *not* incarcerated.[15] *See Adoption of Lily T.*, 2010 ME 58, ¶ 21, 997 A.2d 722 (explaining that an incarcerated parent or a parent subject to a protection order prohibiting contact must "make an even greater effort to foster a nurturing relationship with the child using the means available" (quotation marks omitted)); *Adoption of Hali D.*, 2009 ME 70, ¶¶ 2-3, 974 A.2d 916; *In re Daniel C.*, 480 A.2d 766, 768-69 (Me. 1984).

[¶21] We also cannot conclude that the court clearly erred or abused its discretion when it determined that termination of the father's parental rights is in the child's best interest. *See* 18-A M.R.S. § 9-204(b); 22 M.R.S. § 4055(1)(B)(2)(a). "In determining whether termination is in the child's best

---

[15] We are unpersuaded by amicus curiae Kristina Dougherty's suggestion that we should interpret 18-A M.R.S. § 9-204 (2017) as requiring the court, when a guardian seeks termination of a parent's parental rights, to find a "substantial change in circumstances" and that termination would be in the child's best interest *before* considering the parent's fitness. Even viewing a guardian's petition to terminate parental rights as including a request to terminate the guardianship, pursuant to the statutes applicable in this case, no showing of a change in circumstances would have been required for the court to grant that request. *See* 18-A M.R.S. § 5-210 (2017); *see also* 18-C M.R.S. § 5-210 (2020). In addition, as we have explained, the required procedure of considering parental fitness before addressing a child's best interest is meant to *protect* a parent's fundamental right to raise and nurture their children. *In re Scott S.*, 2001 ME 114, ¶¶ 19-20, 775 A.2d 1144; *see Adoption by Stefan S.*, 2020 ME 5, ¶ 19, 223 A.3d 468.

interest, a court must consider many factors, including the needs of the child, the child's age, attachment to relatives, periods of attachment and separation, the child's ability to integrate into a substitute placement or back into his parents' home, and the child's physical and emotional needs." *Adoption of Lily T.*, 2010 ME 58, ¶ 37, 997 A.2d 722 (quotation marks omitted); *see* 18-A M.R.S. § 5-101(1-A) (2017) (listing factors that the court must consider in determining the best interest of the child); 22 M.R.S. § 4055(2) (2017) (listing "[p]rimary considerations," including the best interest of the child, that a court must take into account in deciding to terminate parental rights). "[P]ermanency in a particular case must be fashioned from the actual circumstances and needs of the children before the court." *In re Children of Meagan C.*, 2019 ME 129, ¶ 20, 214 A.3d 9 (alteration omitted) (quotation marks omitted).

[¶22]  We agree with the father and amici that evidence of a safe and nurturing guardianship in place at the time of the termination hearing—with the parent's consent, if not at his or her direction—is evidence that the court should consider in determining whether termination of parental rights is in the child's best interest. *See Adoption of Lily T.*, 2010 ME 58, ¶ 37 n.6, 997 A.2d 722. Contrary to the father's and amici's arguments, however, we cannot say that

evidence of that nature will necessarily preclude a finding that termination of parental rights is in the child's best interest, even where it indicates a responsible choice. *See id.*

[¶23] The best interest standard "is not limited to whether or not there is affirmative evidence that contact with an absent parent will be harmful to the child." *Id.* ¶ 39 (quotation marks omitted); *see In re Child of Amber L.*, 2018 ME 91, ¶¶ 7-8, 188 A.3d 876; *In re Children of Nicole M.*, 2018 ME 75, ¶¶ 26-27, 187 A.3d 1. The constellation of relevant circumstances will be different in each case. *See In re Alijah K.*, 2016 ME 137, ¶ 16, 147 A.3d 1159. In some cases, trial courts will determine that the permanency required to protect the child's well-being can be achieved without severing the parent's rights. *See, e.g.*, *In re Marcus S.*, 2007 ME 24, ¶ 10, 916 A.2d 225 ("Although permanency is often achieved through adoption, permanency can also be achieved through other arrangements."). In others, they will determine that uncertainty surrounding the parent's role in the child's life makes termination of the parent's rights necessary to achieve permanency, despite the existence of a safe guardianship or similar arrangement.[16] *See, e.g.*, *In re Children of*

---

[16] That is not to say that termination of parental rights is appropriate simply *because of* the guardianship or similar arrangement. A guardian seeking to terminate a parent's parental rights in anticipation of adoption must meet the same high burden of proof as any other petitioner. *Adoption by Stefan S.*, 2020 ME 5, ¶¶ 7-9, 223 A.3d 468; *see Adoption of Riahleigh M.*, 2019 ME 24, ¶¶ 15-16,

24

*Nicole M.*, 2018 ME 75, ¶¶ 26-27, 26 n.9, 187 A.3d 1 (rejecting an argument that "termination was not necessary to promote the children's best interests" where a permanency guardianship was in place and could continue); *In re Marcus S.*, 2007 ME 24, ¶¶ 9-11, 916 A.2d 225; *In re Michaela C.*, 2002 ME 159, ¶¶ 26-31, 809 A.2d 1245. We afford significant deference to the findings and discretion of the trial court tasked with determining whether termination of parental rights is in the child's best interest. *See In re Michaela C.*, 2002 ME 159, ¶ 27, 809 A.2d 1245 (discussing the trial court's "broad discretion" and "correspondingly weighty responsibility[] to determine the particularly sensitive question of a child's best interest" and noting that "[a]n appellate court's independent evaluation of the evidence is especially inappropriate on a delicate issue of this sort" (quotation marks omitted)); *see also In re Children of Nicole M.*, 2018 ME 75, ¶ 12, 187 A.3d 1.

[¶24] In this case, the court's best interest finding was supported by the evidence of impaired development that coincided with the father's—and, by

---

202 A.3d 1174. The court is tasked not with punishing or rewarding the parent but with determining what is asked of it: whether the petitioner has proved by clear and convincing evidence that the parent is unfit and that termination of the parent's rights will promote the child's best interest. We therefore disagree with amici's arguments that affirming the trial court's judgment in this case will disincentivize parents from seeking alternative care arrangements for their children. Each case will be different, but, in general, where a parent who is unable to provide direct care for a child has arranged for someone else to provide the necessary care (or consented to such an arrangement), termination of parental rights is less likely to be warranted.

extension, the child's—instability, and by the evidence of the child's ongoing uncertainty regarding the father's role in his life.[17]  The child is now twelve years old.  We cannot conclude that the court committed clear error or exceeded the bounds of its discretion in determining, by clear and convincing evidence, that it was not in the child's best interest to wait several more years, in a state of uncertainty, to see whether the father would develop the ability to meet his needs.

The entry is:

Judgment affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law, LLC, Berwick, for appellant father

Matthew P. Mastrogiacomo, Esq. (orally), The Mastrogiacomo Law Office, PA, Lewiston, for appellant mother

Molly Watson Shukie, Esq. (orally), and Jeffrey A. Schwartz, Esq., Linnell, Choate, & Webber LLP, Auburn, for maternal aunt and uncle

---

[17]  When asked about the father's role in his life, the child testified that he believed—and worried—that the father intended to have the child live with him after being released from prison. He also testified about his understanding of guardianship and adoption by stating that "when you're adopted, . . . the people that adopt you become like your parents. . . . [W]hen it's your guardians, they're just like people you live with.  They're not real parents."  He said he worried about a future where he might have to leave the aunt and uncle's care: "One of the worries that I have is, like, if I end up with [the mother] or [the father], and something happened again, like, where would I end up then?"

Kristina Dougherty, Esq., amicus curiae pro se

Lauren Wille, Esq., Disability Rights Maine, Augusta, for amicus curiae Disability Rights Maine

Androscoggin County Probate Court docket number A-2018-007
FOR CLERK REFERENCE ONLY